**EXHIBIT 1**

FILED

'06 FEB 17 AM 51

CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

DEMETRIUS BROWN,                    )
        Plaintiff,                  )
                                    )
                                    )
                                    )
        v.                          )      Civil Action No. 04-379E
                                    )
U.S. JUSTICE DEPARTMENT,            )
BUREAU OF PRISONS, FCI MCKEAN,      )
WARDEN JOHN J. LAMANNA,             )
REGIONAL DIRECTOR D. SCOTT          )
DODRILL, MEDICAL DIRECTOR,          )
NEWTON E. KENDIG, DIRECTOR          )
HARLEY G. LAPPIN,                   )
        Defendants.                 )
_____    )

**DEMETRIUS BROWN'S AFFIDAVIT FOR
PRELIMINARY INJUNCTION AGAINST
DEFENDANTS FOR RETALIATION**

I, <u>DEMETRIUS BROWN</u>, herein as Plaintiff, hereby affirm and

declare under penalty of perjury, 28 U.S.C. §1746, the following:

1. Irreparable injury, or extraordinary irreparable harm, or

the rights and priviliges of the Plaintiff would be destroyed of

which he has no adequate remedy at law if defendants, their agents,

employees, successors in interest and all other persons in active

concert or participation with them, harrassed, threatened, punished,

or retaliated in any way against Plaintiff because he filed this

action or against any other prisoners because they submitted

affidavits in this case on behalf of Plaintiff, or to transfer

1 of 4

Plaintiff to any other institution, without his express consent, during the pendency of this action.

2. The First Amendment of the United States Constitution guarantees Plaintiff the right to Petition the Government for Redress of Grievance, including the right to Access of the Courts.

3. The need for injunctive relief is apparent to maintaining the civil action above, in the court, until resolution and/or thereafter. Thus, preventing Defendants from any illegal conduct or action in bad faith, arbitrary, capricious, or wanton injurious manner to setting the stage of having the Court to result in dismissing Plaintiff's suit prematurely for technical reasons.

4. There is no adequate remedy at law for which Defendants could intervene in the Plaintiff's Access to the Courts whereby manipulating late responses to Plaintiff's filings, or total destruction of papers to be filed in accordance with the action for meeting deadlines critical to the prosecution of the action by Plaintiff.

5. There would be no rational basis for the actions of Defendants except to escape judgment or responsibility, both personally and professionally.

6. There is clear and convincing evidence that Defendants have already perpetrated acts upon Plaintiff, causing damage, for which there is no reasonable basis for such. They are:

> a) Transferring Plaintiff during the pendency of
> a separate action previously submitted into Court.
> The transfer resulting in costing Plaintiff, time

money, and expenses such as materials and advice
to maintaining litigation. Plaintiff's suit,
because of the Defendants actions, allowed the
Court to dismiss it. Although, without prejudice
but, still as a result to the above. See **Exhibit la.**

b) Transferring Plaintiff from a prison (FCI McKean)
whose policy on smoking was changed to reflect the
national consensus on policy, 28 CFR §551.162(b)(1),
to a prison (FCI RayBrook) whose policy defied the
new national consensus on policy, thus subjecting
Plaintiff to Environmental Tobacco Smoke despite
the Administrative Tort, and Administrative Remedy
requests made by Plaintiff requesting not to be
exposed to such. Defendants have thereby caused
Plaintiff additional harms after knowing Plaintiff's
requests addressing grievance to Environmental
Tobacco Smoke and also to causing Plaintiff addit-
ional harm when the national policy dictated
otherwise. See **Exhibit lb.**

c) Failure by the Inmate Account Officer at FCI
RayBrook in this cited above civil action to
withdraw funds of Plaintiff's under Court Order
for Plaintiff's forma pauperis status to paying
court costs for filing fees which thus, establishes
suit in court. The Inmate Account Officer, even
upon direct mandatory order failed to withdraw
funds for paying filing fees. Plaintiff, as a
result to not allowing this suit to be dismissed
because of failure to pay filing fees, thus establ-
ish the suit, had outside sources pay the court
fees contingent on reimbursement, so that the suit
could commence and reach an ultimate resolution
of my reasons for grievance. See **Exhibit lc.**

d) Ridding the Law Library of key essential material
needed to sustaining and presenting a meaningful
prosecution of this civil action. Law Library Books
pertaining to United States Code Annotated have
been replaced for the Lawyer's Edition which is not
substantial for presenting legal issues to the Court.
The lack of sufficient number of typewriters in
a prison whose population exceeds 1,400. The need
for sufficient and constant supply of materials
such as paper, staples, paper clips, whiteout,
envelopes, etc. The unreasonable fixation of prices
for materials associated with maintaining legal

action. The unreliable hours for maintaining an
open Law Library for any access to the Courts,
where hours are horrendously reduced below product-
ive levels or completely inaccessible due to unness-
esarily lengthy lockdowns and for apparently for
no reason.

e) Legal mail is not being sent out as readily
given to prison officials. Mail is left to sit
days in and out, at times, when needed to be sent
out notifying Defendants of matters or for filing
motions into Court for meeting deadlines. Mail is
not notified to Plaintiff upon receipt for pick-
up or retrieval when mail is especially marked
Legal Mail, Open in presence of Inmate, or mail
by Defendants notifying him of filed motions.
Mail specifically sent in previous case nearly
caused dismissal where court notified Plaintiff
to respond to Defendants' Motion to Dismiss but,
had not been received, as Plaintiff had not signed
for such. Prison Officials blatantly failed to
notify Plaintiff to retrieve mail for pick-up and
signing. However, the Court, persistent enough,
recognized the matter and therefore ordered the
mail to be sent directly to Plaintiff by whatever
means for notifying him to respond. See **Exhibit 1(a),
¶11-17.**

7. There would likely be a continuation of the practices
committed by Defendants as listed in ¶6, in which Plaintiff
will suffer irreparable injury of his First Amendment right to
Access to the Court.

I, <u>DEMETRIUS BROWN</u>, hereby affirm and declare under penalty
of perjury, 28 U.S.C. §1746, that the foregoing is true and correct.

2/6/06
<u>Dated</u>

<u>Demetrius Brown</u>

4 of 4

EXHIBIT la

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT


DEMETRIUS BROWN,                  )
       Petitioner,               )
                               )
                               )
       v.                         )   No. **04-1360**
                               )
U.S. DEPARTMENT OF JUSTICE        )
BUREAU OF PRISONS,                )
       Respondent.               )


**AMENDED**
**PETITION FOR PRELIMINARY INJUNCTION**


    **COMES NOW**, <u>DEMETRIUS BROWN</u>, herein as Petitioner, proceeding Pro-Se, hereby petitions this Honorable Court, the United States Court of Appeals for the District of Columbia, pursuant to Federal Rules of Appellate Procedure (FRAP) 15(a)(4), and 42 U.S.C. §1983, Civil Rights, for an order entered enjoining the U.S. Department of Justice Bureau of Prisons (BOP) from Retaliating against Petitioner for exercising his First Amendment right to Petition the Court in Redress of Grievance to the BOP's failure to maintain custody classification of Petitioner with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in determination of "Months to Release," "Severity of Current Offense," and "Type of Prior Commitment."

                                             Respectfully submitted,

                                        *Demetrius Brown*
                                        Demetrius Brown
                                        Reg. No. 21534-039
                                        FCI Raybrook
                                        P.O. Box 9001
                                        Raybrook, NY. 12977

cc:file
db/db

## STATEMENT OF ISSUE

WHETHER THE U.S. DEPARTMENT OF JUSTICE BUREAU OF
PRISONS (BOP) RETALIATED AGAINST PETITIONER FOR
EXERCISING HIS FIRST AMENDMENT RIGHT TO PETITION
THE COURT IN REDRESS OF GRIEVANCE TO THE BOP'S
FAILURE TO MAINTAIN CUSTODY CLASSIFICATION OF PET-
ITIONER WITH SUCH ACCURACY, RELEVANCE, TIMELINESS,
AND COMPLETENESS AS IS NECESSARY TO ASSURE FAIRNESS
IN DETERMINATION OF "MONTHS TO RELEASE," "SEVERITY
OF CURRENT OFFENSE," AND "TYPE OF PRIOR COMMITMENT."

FACTS


1. On October 11, 2004, I completed for mailing by depositing Petition for Review of U.S. Justice Department-Office of Information & Privacy Order affirming the Bureau of Prisons Action on my request that the Bureau of Prisons maintain custody classification of Petitioner with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in determination of "months to release," "severity of current offense," and "type of prior commitment." See **Exhibit A.**

2. On October 14, 2004, the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit filed and docketed the case. See **Exhibit B.**

3. On or about October 20, 2004, my previous Case Manager, Laura Lechien, at FCI McKean informed me that I had been designated for transfer.

4. On October 26, 2004, an order enclosed by Letter from the Deputy Clerk, Lisa M. English of the Columbia Circuit, regarding the Petition for Review - was deposited for mail to the Warden at FCI McKean. **See Exhibit C.**

5. On October 27, 2004, I received from FCI McKean's Administration Office a memorandum order to pack all property belonging to me for transfer.

6. On October 28, 2004, all property belonging to me was packed and delivered to Receiving and Delivery (R & D) for Transfer.

7. On October 29, 2004, I was taken into custody of Federal Correctional Officers for transfer.

8. On October 29, 2004, I arrived at the U.S. Pennitentiary-Lewisburg Hospital Holdover Unit pending completion of tranfer.

9. On October 31, 2004, I wrote the Clerk of Court for the Columbia Circuit by letter informing the Clerk of my sudden transfer;

that notification was given in order that any correspondence mailed will be forwarded to the new institution. Also, stating that the reason for the sudden transfer is likely in retaliation for filing the pending Petition for Review.

10. On October 31, 2004, I wrote the Regional Director concerning the fact that I was being transferred and that I was aware at that time that I would be transferring to FCI Raybrook, a medium/high security institution - the same as FCI McKean. I also stated that I would complain of retaliation against my First Amendment Right to Petition the Court in redress of Grievance if the Regional Director did not adhere to stopping the transfer.

11. On November 3, 2004, FCI McKean after receiving the Order from the Court with instructions to delivering the correspondence to me, mailed the said items to FCI Raybrook, the facility designated for my incarceration. See **Exhibit D.**

12. On November 4, 2004, I was continued on course for transfer from the U.S. Pennitentiary - Lewisburg Hospital Holdover Unit to the designated facility, FCI Raybrook.

13. On November 4, 2004, I arrived at FCI Raybrook as a newly admitted inmate.

14. On November 9, 2004, FCI Raybrook Warden's Office received the October 26, 2004 Order issued by the Columbia Circuit as subsequently forwarded by FCI McKean Prison Officials on October 3, 2004- after it having received the order. See **Exhibit E.**

15. On November 22, 2004, I submitted a request to FCI Raybrook's Business Office inquiring whether any mail was received by the institution from FCI McKean that is being withheld. See **Exhibit F.**

16. On November 23, 2004, FCI Raybrook Warden's Office forwarded the Columbia's Circuit Order to the FCI Raybrook Mail Room.

17. On November 23, 2004, I was called by Prison Officials to pick-up and sign for receipt of mail items originating from the Columbia Circuit.

18. On November 23, 2004, after obtaining the Order issued from the Court, I began to earnestly fill and complete forms and other requested information necessary for the immediate impending deadline for November 26, 2004. See **Exhibit G.**

19. On November 23, 2004, having contemplated whether deadline could be met timely for requested information as well as for filing fee, I decided to call and ask family to borrow $250 for meeting with the filing fee deadline. Family member with reluctance stated that a loan could be made but that it would have to be repaid of which the filing fee would subsequently be mailed to the Court from an address in Michigan.

20. On November 24, 2004, I completed all information requested by the Court for mailing save the Prisoner Trust Account Report where after dilligently inquiring of Prison Officials to complete, none were desiring to do so, i.e. Case Manager (Business Office closed for Holiday, and Counselor on vacation). Also, due to the Bureau of Prisons transferring Petitioner to a new institution, from FCI McKean (the previous institution confined) but where the account statement from a previous civil action while at McKean is overlapped by the pending action for the qualifying preceeding 6 months, I submitted that instead.

21. On November 25, 2004, a family member mailed by U.S. Postal Service-overnight mail, the $250 filing fee as to ensure that the deadline would be kept for the civil action no. 04-1360 pending in the Columbia Circuit.

22. On November 26, 2004, the U.S. Postal Service confirmed by signature, that the U.S. Court of Appeals for the Columbia Circuit received for filing the $250 fee.

23. On November 28, 2004, I nevertheless submitted written request to the FCI Raybrook Business Office for the filling and completing of the Prison Trust Account Report for submittal to the Columbia Circuit on contingency that other payments or fees may incur that I am incapable of paying. See **Exhibit H.**

24. On November 29, 2004, the United States Court of Appeals for the Columbia Circuit issued an Order extending time to file initial submissions to the Court. The new due date is now January 3, 2004. See **Exhibit I.**

25. On November 30, 2004, the FCI Raybrook Business Office responded to my request that it fill and complete the Prison Trust Account Report by doing so as stated.

26. On November 30, 2004, I mailed to the Columbia Circuit the Prison Trust Account Report with a letter included stating that I was aware of the $250 filing fee being paid by a family member but that I would for purposes of any informa pauperis associated with paying for counsel be established.

27. That, subsequent to my arrival and during the delimma of trying to file on time, necessary papers for the court, I was seen by an FCI Raybrook Case Manager for a "Team Meeting." The Case Manager informed me that he did not understand why I was transferred from FCI McKean to FCI Raybrook. That, however, as it may be I would retain a management variable coded for populattion pressures and that the variable would not expire until further notice despite that I was classified as a low level security inmate and outside of a 500 mile radius to my release address. See **Exhibit J.**

28. That, I have been requesting the BOP to place me in my proper security classification rating for some time. I had made contact with Senator Carl Levin of Michigan to investigate the matter, but was unsuccessful due to the BOP's interpretation of policy for management variables coded for "population pressures." See **Exhibit K.**

I, <u>DEMETRIUS BROWN</u>, hereby affirm and declare under penalty of perjury, 28 U.S.C. §1746, that the foregoing is true and correct.

12/14/04
Dated

cc:file
db/db

## RELIEF REQUESTED

Petitioner request the following relief:

1. Preliminary Injunctive Relief;

2. Declaratory Judgment;

3. Money Damages;

4. Equitable Relief.

## CERTIFICATE OF SERVICE

I, DEMETRIUS BROWN, hereby certify that the foregoing docum-
ents bearings sufficient postage was given, by hand, to FCI Raybrook's
Prison Officials for contraband inspection and for deposit into
the Prison Mail System on the _15th_ day of December, 2004, for mailing,
to the following:


Clerk of Court
UNITED STATES COURT OF APPEALS
for the DISTRICT OF COLUMBIA CIRCUIT
333 Constitution Avenue, N.W.
Washington, D.C. 20001-2866


Demetrius Brown
Reg.No. 21534-039
FCI Raybrook
P.O. Box 9001
Raybrook, NY. 12977

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 04-1360**                                    **September Term, 2004**

Demetrius Brown,
             Petitioner

v.

U.S. Department of Justice Bureau of Prisons,
             Respondent

Filed On:



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED

JUL 20 2005

CLERK

**BEFORE:**    Ginsburg, Chief Judge, and Randolph and Tatel, Circuit Judges

## O R D E R

Upon consideration of the petition for review and the supplement thereto; the motions to amend petition for review; the motions to proceed in forma pauperis; the motion to dismiss, and the responses thereto; the motion for appeal conference; the motion for jury trial; the motion for appearance; the motion for oral argument; the motion for consolidation; the petition for preliminary injunction and the amendment thereto; this court's orders to show cause filed February 7, 2005 and April 6, 2005, and the response thereto; it is

**ORDERED** that the orders to show cause be discharged. It is

**FURTHER ORDERED** that the motions to proceed in forma pauperis be dismissed as moot. The filing fee for this case was paid on November 26, 2004. It is

**FURTHER ORDERED** that the motions to amend the petition for review be granted. It is

**FURTHER ORDERED** that the motion to dismiss be granted. Petitioner has cited no basis for this court's original jurisdiction over his claims. Federal jurisdiction, if any, would lie in the district court in the first instance. See 28 U.S.C. § 1331; 5 U.S.C. § 552a(g)(1). Further, to the extent petitioner is seeking relief in the nature of habeas, such claims would also be properly brought in the district court in the first instance. See 28 U.S.C. §§ 2241, 2255. This dismissal is without prejudice to any right petitioner may have to file his petition in the appropriate district court. It is

**FURTHER ORDERED** that the petition for preliminary injunction and the amendment thereto be denied. Petition has failed to demonstrate the requested relief is warranted. It is

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

**No. 04-1360**                          **September Term, 2004**

> **FURTHER ORDERED** that the motion for appeal conference, the motion for jury trial, the motion for appearance, the motion for oral argument, and the motion for consolidation be dismissed as moot.

> Pursuant to D.C. Circuit Rule 36, this disposition will not be published.  The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing en banc.  <u>See</u> Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

<u>**Per Curiam**</u>

EXHIBIT 1b

Dated: March 15, 2004.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 04–6480 Filed 3–23–04; 8:45 am]

BILLING CODE 4160-01-S

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 522**

**Implantation or Injectable Dosage Form New Animal Drugs; Trenbolone and Estradiol**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is amending the animal drug regulations to reflect approval of a supplemental abbreviated new animal drug application (ANADA) filed by Ivy Laboratories, Div. of Ivy Animal Health, Inc. The supplemental ANADA provides for the addition of tylosin tartrate to an approved subcutaneous implant containing trenbolone and estradiol used for increased rate of weight gain in feedlot heifers.

**DATES:** This rule is effective March 24, 2004.

**FOR FURTHER INFORMATION CONTACT:** Eric S. Dubbin, Center for Veterinary Medicine (HFV–126), Food and Drug Administration, 7500 Standish Pl., Rockville, MD 20855, 301–827–0232, e-mail: *edubbin@cvm.fda.gov.*

**SUPPLEMENTARY INFORMATION:** Ivy Laboratories, Div. of Ivy Animal Health, Inc., 8857 Bond St., Overland Park, KS 66214, filed a supplement to ANADA 200–346 for COMPONENT TE–IH (trenbolone acetate and estradiol) with TYLAN, a subcutaneous implant used for increased rate of weight gain in heifers fed in confinement for slaughter. The supplemental ANADA provides for the addition of a pellet containing 29 milligrams tylosin tartrate to the approved implant. The supplemental application is approved as of February 23, 2004, and the regulations are amended in 21 CFR 522.2477 to reflect the approval. The basis of approval is discussed in the freedom of information summary.

In accordance with the freedom of information provisions of 21 CFR part 20 and 21 CFR 514.11(e)(2)(ii), a summary of safety and effectiveness data and information submitted to support approval of this application may be seen in the Division of Dockets

Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852, between 9 a.m. and 4 p.m., Monday through Friday.

Under section 512(c)(2)(F)(iii) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 360b(c)(2)(F)(iii)), this approval qualifies for 3 years of marketing exclusivity beginning February 23, 2004.

The agency has determined under 21 CFR 25.33(a)(1) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

**List of Subjects in 21 CFR Part 522**

Animal drugs.

■ Therefore, under the Federal Food, Drug, and Cosmetic Act and under the authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 522 is amended as follows:

**PART 522—IMPLANTATION OR INJECTABLE DOSAGE FORM NEW ANIMAL DRUGS**

■ 1. The authority citation for 21 CFR part 522 continues to read as follows:

**Authority:** 21 U.S.C. 360b.

■ 2. Section 522.2477 is amended by revising paragraph (b)(1) and by adding paragraph (d)(2)(i)(E) to read as follows:

**§ 522.2477    Trenbolone acetate and estradiol.**

\*    \*    \*    \*    \*

(b) \* \* \*

(1) No. 021641 for use as in paragraphs (d)(1), (d)(2)(i)(A), (d)(2)(i)(B), (d)(2)(i)(C), (d)(2)(i)(E), (d)(2)(iii), and (d)(3) of this section.

\*    \*    \*    \*    \*

(d) \* \* \*

(2) \* \* \*

(i) \* \* \*

(E) 80 mg trenbolone acetate and 8 mg estradiol (one implant consisting of 5 pellets, each of 4 pellets containing 20 mg trenbolone acetate and 2 mg estradiol, and 1 pellet containing 29 mg tylosin tartrate) per implant dose for use as in paragraph (d)(2)(ii)(B) of this section.

\*    \*    \*    \*    \*

Dated: March 11, 2004.

**Steven D. Vaughn,**

*Director, Office of New Animal Drug Evaluation, Center for Veterinary Medicine.*

[FR Doc. 04–6483 Filed 3–23–04; 8:45 am]

BILLING CODE 4160-01-S

---

**DEPARTMENT OF JUSTICE**

**Bureau of Prisons**

**28 CFR Part 551**

**[BOP–1084–F]**

**RIN 1120–AA79**

**Smoking/No Smoking Areas**

**AGENCY:** Bureau of Prisons, Justice.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Bureau of Prisons (Bureau) revises its regulations pertaining to smoking/no smoking areas in Bureau facilities. The revised regulations require the Warden to designate a smoking area for use in instances where smoking is to be part of an authorized religious activity. If the Warden designates smoking areas for general use (that is, for smoking which is not part of an authorized religious activity), the area must be in visibly designated outdoor locations. The amendment also requires the concurrence of the Regional Director if the Warden chooses not to designate smoking areas for general use. Once this occurs, the Regional Director's concurrence is also required if the Warden later chooses to designate smoking areas for general use at the institution. We intend this amendment to promote a clean air environment and to protect the health and safety of staff and inmates.

**EFFECTIVE DATE:** This rule will be effective on July 15, 2004.

**ADDRESSES:** Rules Unit, Office of General Counsel, Bureau of Prisons, 320 First Street, NW., Washington, DC 20534.

**FOR FURTHER INFORMATION CONTACT:** Sarah Qureshi, Office of General Counsel, Bureau of Prisons, phone (202) 307–2105.

**SUPPLEMENTARY INFORMATION:** The Bureau adopts as final a revision of its regulations in 28 CFR part 551, subpart N on smoking. We published a proposed rule on this subject on November 25, 1998 (63 FR 65502), which we modified in a supplemental notice on May 6, 1999 (64 FR 24468).

Both the original proposed rule and the supplemental notice would eliminate indoor smoking (with the

**1**

exception of smoking which is to be part of an authorized religious activity). The supplemental notice further allowed the Warden to eliminate outdoor smoking. The Regional Director's concurrence would be required either for the Warden's initial decision to eliminate outdoor smoking or for a subsequent decision to reinstate outdoor smoking. After due consideration of comments received, the Bureau is adopting as final the regulations proposed in the supplemental notice, with one change: After internal consideration, to promote accuracy of our regulations, we retain the original language in § 551.160, Purpose and Scope.

The supplemental notice contained a response to comments received on the original proposed rule. The Bureau received further comments on the supplemental notice. This final rule contains a response to comments received on the supplemental notice together with the response to comments received on the original proposed rule.

One commenter objected to the provisions in the supplemental notice, stating that he believed that the regulations currently in effect which govern smoking at Bureau facilities are adequate to protect inmates and staff from second-hand smoke. The commenter believed eliminating all indoor smoking will create hardships for staff and inmates alike and that Wardens should not be given the discretion to designate an institution as totally smoke-free. The commenter suggests that a resulting lack of uniformity in the smoking policy among the Bureau's various institutions would be tolerable if inmate requests for a transfer based upon a smoking preference would be allowed. The commenter further believes elimination of tobacco products at an institution will have an adverse economic effect on businesses and vendors who serve an institution's commissary as well as funds from tobacco sales, which as with other commissary sales, may be used for any purpose accruing to the benefit of the inmate body.

This same commenter, in response to another proposed rule on inmate discipline sanctions involving the smoking policy, states that nicotine addiction should be recognized as a serious medical condition requiring treatment and therapy and that smoking cessation programs and nicotine patches should be offered to assist those inmates who wish to quit smoking instead of elevating the severity level of the offense.

Four other commenters objected to the supplemental notice, proposing instead a total ban on the possession

and use of lighted tobacco products for all prisoners, staff, management and visitors. Several of these commenters expressed dissatisfaction with the enforcement of the current smoking policy. One of these commenters alternately proposed separate smoking and non-smoking housing units. This commenter recommended limitations on dispensing cigarettes to ensure that the cigarette would be consumed under staff supervision at the point of purchase.

Commenters on the original proposed rule expressed a general belief that ... prohibiting indoor smoking within Bureau facilities will have little impact on reducing smoking and improving the air quality. Specifically, four commenters stressed that the current restrictions on smoking are rarely enforced. One commenter, alleging that most staff are smokers, expressed concern that the proposed regulations are not clear as to whether staff must also adhere to the ban on indoor smoking. This commenter included statements from four individuals concurring with his views.

As a practical alternative, three commenters on the original proposed rule support non-smoking units instead of a total prohibition against indoor smoking. One commenter expressed concern that tobacco use not be restricted for religious purposes. The supplemental notice was clarified to address this concern. One commenter expressed concern over the availability of health services support (including nicotine patches and nicorette gum) to those wishing to quit smoking. Four commenters objected to eliminating the Warden's authority to designate indoor smoking areas. These commenters believed that designated outdoor smoking areas would lack protection from adverse weather. They requested that the proposed rule specifically assure the availability of a protective environment for designated outdoor smoking areas. One commenter on the original proposed rule suggested installing smoke detectors in all cells. Two commenters on the original proposed rule suggested that all tobacco products be banned and no tobacco products be sold in federal prisons.

In response, the Bureau wishes to emphasize its intention to protect the health and safety of both staff and inmates. The hazards associated with tobacco smoke and second-hand inhalation of smoke by nonsmokers is well documented and the known health risks associated with smoking support implementation of stricter smoking/no smoking rules. The Bureau believes that adopting the provisions in the

supplemental notice is the most practicable step toward promoting a clean air environment and protecting the health and safety of staff and inmates. Under the provisions in the supplemental notice, a Warden must designate a smoking area for use in instances where smoking is to be part of an authorized religious activity. The Warden may designate only outdoor smoking areas for general use (that is, for smoking which is not part of an authorized religious activity). Designating living units within an institution as smoking and non-smoking will not eliminate the health risks associated with passive inhalation of second-hand smoke indoors. By further allowing the Warden the discretion not to designate any smoking areas for general use if the Regional Director concurs, the Bureau is essentially adopting the recommendations of several of the commenters. If an institution did not have designated smoking areas for general use, that institution's commissary would not have corresponding tobacco products available for sale. The Bureau does not believe that removing tobacco products from the institution's commissary will have a significant economic impact as defined by the controlling statutes noted below. While there may be some impact on commissary profits, the Bureau believes that the health benefits outweigh any potential drop in such profits.

With respect to concerns raised by various commenters over enforcement of the smoking regulations, the Bureau is committed to investigate reported violations of the smoking policy. To emphasize the Bureau's commitment to reducing the health risks associated with tobacco smoke, the Bureau, in a separate document (64 FR 9432), proposed to elevate violations of the smoking policy from a low moderate category act to a moderate category prohibited act. Maintaining a smoke-free environment necessarily means that staff and visitors will be bound by the restrictions.

With respect to concerns over the availability of health services support for those inmates who wish to stop smoking, the Bureau notes that currently institutions are encouraged to offer smoking cessation programs. Upon implementation of these revised regulations, smoking cessation programs are to be offered at all institutions. Nicotine patches are available at the inmate's expense through commissary purchase.

With respect to the concern over the lack of uniformity in the application of policy system-wide, the Bureau believes

that role of the Regional Director will serve to minimize apparent disparity. The designation of an inmate to any particular institution remains subject to separate procedures designed to assess the inmate's designation needs in light of management variables and public safety factors.

With respect to the more technical comments, the Bureau notes that the effect on businesses and vendors who serve an institution's commissary does not rise to the level of an economically significant action. The Bureau does not believe additional smoke detectors are necessary as a deterrent to violations of the smoking policy because a total ban on indoor smoking simplifies enforcement. The Bureau is in compliance with fire safety codes on smoke detectors in its housing units. Nor does the Bureau believe it to be practicable to impose limitations on the dispensing and consumption of tobacco products as recommended by one commenter. Finally, the Bureau declines to incorporate the recommendation to require in the regulation some provision to accommodate outdoor smokers from adverse weather conditions. Security considerations make a blanket assurance of such accommodations impracticable. However, each Warden may give consideration to this issue based upon the security concerns of the institution and local weather conditions.

Members of the public may submit comments concerning this rule by writing to the previously cited address. These comments will be considered but will receive no response in the **Federal Register**.

**Executive Order 12866**

This regulation has been drafted and reviewed in accordance with Executive Order 12866, "Regulatory Planning and Review", section 1(b), Principles of Regulation. The Director of the Bureau of Prisons has determined that this rule is not a "significant regulatory action" under Executive Order 12866, section 3(f), and accordingly this rule has not been reviewed by the Office of Management and Budget.

**Executive Order 13132**

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. Therefore, in accordance with Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a Federalism Assessment.

**Regulatory Flexibility Act**

The Director of the Bureau of Prisons, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact upon a substantial number of small entities for the following reasons: This rule pertains to the correctional management of offenders committed to the custody of the Attorney General or the Director of the Bureau of Prisons, and its economic impact is limited to the Bureau's appropriated funds.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a major rule as defined by § 804 of the Small Business Regulatory Enforcement Fairness Act of 1996. This rule will not result in an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

**List of Subjects in 28 CFR Part 551**

Prisoner.

**Harley G. Lappin,**
*Director, Bureau of Prisons.*

■ Under the rulemaking authority vested in the Attorney General in 5 U.S.C. 552(a) and delegated to the Director, Bureau of Prisons, we amend 28 CFR part 551 as set forth below.

**SUBCHAPTER C—INSTITUTIONAL MANAGEMENT**

**PART 551—MISCELLANEOUS**

■ 1. Revise the authority citation for 28 CFR 551 to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 1512, 3621, 3622, 3624, 4001, 4005, 4042, 4081, 4082 (Repealed in part as to offenses committed on or after November 1, 1987), 4161–4166 (Repealed as to offenses committed on or after November 1, 1987), 5006–5024 (Repealed October 12, 1984 as to

offenses committed after that date), 5039; 28 U.S.C. 509, 510; Pub. L. 99–500 (sec. 209); Attorney General's May 1, 1995 Guidelines for Victim and Witness Assistance.

■ 2. Revise subpart N to read as follows:

**Subpart N—Smoking/No Smoking Areas**

Sec.
551.160   Purpose and scope.
551.161   Definitions.
551.162   Designated smoking areas.

**Subpart N—Smoking/No Smoking Areas**

**§ 551.160   Purpose and scope.**

To advance towards becoming a clean air environment and to protect the health and safety of staff and inmates, the Bureau of Prisons will restrict areas and circumstances where smoking is permitted within its institutions and offices.

**§ 551.161   Definitions.**

For purpose of this subpart, *smoking* is defined as carrying or inhaling a lighted cigar, cigarette, pipe, or other lighted tobacco products.

**§ 551.162   Designated smoking areas.**

(a) The Warden must designate a smoking area for use in instances where smoking is part of an authorized inmate religious activity.

(b)(1) The Warden may designate only outdoor smoking areas for general inmate use (that is, for smoking which is not part of an authorized religious activity). These smoking areas must be clearly identified.

(2) The Warden, with the Regional Director's concurrence, may choose not to designate smoking areas for general use. Once this occurs, the Regional Director's concurrence is required if the Warden later chooses to designate smoking areas for general use at the institution.

[FR Doc. 04–6495 Filed 3–23–04; 8:45 am]
**BILLING CODE 4410-05-P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

[DE 070–1043a; FRL–7639–4]

**Approval and Promulgation of Air Quality Implementation Plans; Delaware; Amendments to Regulation 24, Section 10—Aerospace Coatings**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

---

**SUMMARY:** EPA is taking direct final action to approve a revision to the State



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Federal Correctional Institution*
*Ray Brook, New York*


DATE: May 5, 2005

REPLY TO      /signed/
 ATTN OF: T. R. Craig, Warden

 SUBJECT: Implementation of No Smoking/Tobacco Free Policy

      TO: Inmate Population

In response to the Bureau of Prisons' efforts to advance toward a
clean air environment by the end of this year, and to protect the
health and safety of inmates, the Federal Correctional
Institution, Ray Brook, New York, will eliminate the use of smoke
and smokeless tobacco products by inmates within the institution
and surrounding government property.

Effective November 9, 2005, inmates will no longer be permitted
to use smoke or smokeless tobacco products within the institution
and surrounding government property.  The institution will phase
out the selling of smoke and smokeless tobacco to coincide with
the implementation of this policy.  An area near the Native
American sweat lodge will be designated for authorized religious
activity.

Smoking is defined as carrying or inhaling a lighted cigar,
cigarette, pipe, or other lighted tobacco products.  Cigars,
cigarettes, pipes, other lighted tobacco products, chewing
tobacco, or other smokeless tobacco products will be considered
contraband within the institution and surrounding government
property if found in an inmate's possession.  Inmates who can
establish ownership will be allowed to mail the aforementioned
items, at the inmate's expense, to a destination of the inmate's
choice.  Inmates violating this policy will be subject to
disciplinary action.



UNITED STATES GOVERNMENT

# memorandum

FCI Ray Brook, New York

**DATE:** November 8, 2005

**REPLY TO
ATTN OF:** /signed/
T. R. Craig, Warden

**SUBJECT:** Information Update

**TO:** Inmate Population

Several changes have occurred since my last communication to you on October 11, 2005.  This communication addresses these issues, in addition to providing clarification on other subjects.

Tomorrow, November 9, 2005, is the start of a new era at FCI Ray Brook, that of a tobacco free environment.  During various shakedowns, staff have noticed a growing surplus of cigarettes being stocked and hidden.  I caution you that this may lead to individual discipline, as well as suspension of group privileges that will include viewing of Monday Night Football, late night privileges, unit rotations to mainline, time for phone use, and even loss of recreation privileges.

It appears that the number of instances involving intoxicants has taken a significant decline.  As our focus to eliminate alcohol throughout the institution has had a positive affect, we will continue to limit tomato-based product usage in Food Service to the noon meal Monday through Friday.  However, we began adding fresh tomatoes back to the salad bar, Monday through Friday, during the noon meal only.  Other changes implemented to hinder intoxicant production included a restricted use of mesh bags Monday through Friday, 6 a.m. to 6 p.m.  There has, however, been confusion as to the use of these bags during noontime for the purpose of commissary sales and laundry.  Mesh bags "may" be used for the purpose of transporting purchased commissary goods and laundry to and from inmate cells only.  Unit washer and dryer areas continue to be used as an area of concealment for intoxicants.  Unit laundering privileges may be suspended in individual units if this does not stop immediately.

5

EXHIBIT 1c

May 30, 2005

Demetrius Brown
Reg. No. 21534-039
FCI RayBrook
P.O. Box 9001
RayBrook, N.Y. 12977

Susan Paradise Baxter
United States Magistrate Judge
UNITED STATES DISTRICT COURT
Western District of Pennsylvania
17 South Park Row, Room A280
Erie, PA. 16501

    **RE:** Case No. 04-379 Erie
        Filing Fee

Dear Magistrate Judge Baxter:

    This is a letter of concern involving case number 04-379 Erie, Demetrius Brown v. UNITED STATES JUSTICE DEPARTMENT, et. al. I am concerned at whether the Court will start collecting payment of initial filing fee of $19.36 via custodian, the Bureau of Prisons FCI RayBrook Business Office as ordered by the Court on March 15, 2005.

    In this regard, I have authorized payment on March 20, 2005 by returning form for authorization of custodian to the withdrawal of my account. That, funding has been placed in my account, an amount sufficient for payment of initial filing fee, but there has been no such collection by custodian as of yet.

    For this reason, I would like to know whether I should mail directly to the Court, moneys received to make payment as ordered by the Court for initial filing fee or to wait idly by for the Bureau of Prisons FCI RayBrook Business Office to collect payments, thereby denying due process to me having my case heard in a Court of Law.

    Finally, your immediate response is necessary, in order that I may know how to proceed in a dilemma  I am not in control of. Thank you.

                    Sincerely,

                    Demetrius Brown[1]

cc:file
db/db

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DEMETRIUS BROWN,            )
      Plaintiff,            )
                  )
                  )
      v.            )    C.A. No. 04-379 Erie
                  )
UNITED STATES JUSTICE DEPT.    )
      Defendant.            )


**(PROPOSED) ORDER FOR MANDATE/ENFORCING ORDER
DIRECTING INMATE ACCOUNT OFFICER TO PAY INITIAL
PARTIAL FILING FEE OF LAWSUIT AND THE REMAINING
PORTION OF THE FEE IN INSTALLMENTS**


    Plaintiff has submitted for filing a Civil Rights Complaint which he seeks leave to prosecute in forma pauperis. The filing fee is $150.00. Plaintiff does not have sufficient funds in his prison account to pay the entire filing fee. Therefore, in accordance with 28 U.S.C. §1915(b)(1) the Court on March 15, 2005 ordered that leave to proceed in forma pauperis be granted.

    The Plaintiff in addition was notified that within 20 days of the notice it would be necessary to sign the authorization and send to the Clerk for 1) authorizing the inmate account officer to withdraw from his account the initial partial filing fee of $19.36 and 2) authorizing the inmate account officer to make the remaining installment payments. The Plaintiff by complying has on March 20, 2005 signed and returned to the Clerk AUTHORIZATION. The following order is entered:

2

**AND NOW,** this _____ day of July, 2005

**IT IS HEREBY ORDERED** that the inmate account officer be directed to pay Plaintiff's initial partial filing fee of lawsuit and the remaining portion of the fee in installments. The initial partial filing fee is $19.36. The remaining portion of the fee in monthly payments will be twenty percent of the proceeding month's income credited to Plaintiff's account and also to forward payments from the account, each time the amount in the account exceeds $10.00, to Clerk, United States District Court, until the entire filing fee of $150.00 for Civil Action No. 04-379 Erie has been paid.

**IT IS FURTHER ORDERED** that this is the Mandate/Enforcement of the Court.

**IT IS FURTHER ORDERED** that Plaintiff has complied with the Court's Order on June 8, 2005 for proposal of the foregoing order.

**IT IS FURTHER ORDERED** that the parties are allowed ten (10) days from this date to appeal this order to a district judge pursuant to Local Rule 72.1.3B. Failure to appeal within ten (10) days may constitute waiver of the right to appeal.

s/Susan Paradise Baxter    Digitally signed by s/Susan Paradise Baxter
DN: CN = s/Susan Paradise Baxter, C = US
Date: 2005.07.05 14:12:08 -04'00'
_____
Susan Paradise Baxter
United States Magistrate Judge

cc: Demetrius Brown, 21534-039
    FCI RayBrook
    Post Office Box 9001
    RayBrook, New York 12977

    Clerk of Courts - Finance Office
    Warden - FCI RayBrook
    Inmate Accounting Office

3