**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DEMETRIUS BROWN, )
)
      Plaintiff, )
)
      v. )    CIVIL ACTION NO. 04-379E
)
U.S. JUSTICE DEPARTMENT, )    JUDGE MCLAUGHLIN
BUREAU OF PRISONS, FCI MCKEAN )    MAGISTRATE JUDGE BAXTER
WARDEN JOHN J. LAMANNA, )
REGIONAL DIRECTOR D. SCOTT )    Electronically Filed
DODRILL, MEDICAL DIRECTOR, )
DIRECTOR HARLEY G. LAPPIN, )
)
      Defendants. )

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT
OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

*Pro se* prisoner Demetrius Brown filed a Complaint in this action under the provisions of

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.,* alleging personal

injuries caused by his exposure to second-hand smoke or Environmental Tobacco Smoke

("ETS") during his incarceration at a federal prison located in McKean County, Pennsylvania

("FCI McKean").  Plaintiff later filed a Second Amended Complaint, in which he added a claim

pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S.

388 (1971), alleging violations of his rights under the Eighth and Fourteenth Amendments to the

Constitution.  Specifically, plaintiff alleges that defendants violated his constitutional rights by

implementing and/or carrying out FCI McKean's smoking policy, denying his request not to be

exposed to ETS, and allegedly "fail[ing] to curb non-compliance for indoor . . . smoking beyond

those times specified by policy."  (*See* 2d Am. Compl., ¶¶ 11-14.)  Plaintiff's Second Amended

Complaint does not allege damages or specify the relief sought.

As detailed below, however, the Court should dismiss plaintiff's claims for multiple, independent reasons. To begin with, all of plaintiff's claims accruing before December 28, 2004 are barred by the applicable statutes of limitations. Moreover, plaintiff's *Bivens* claims should be dismissed for the following reasons: (i) plaintiff's constitutional claims against the "U.S. Justice Department," the Bureau of Prisons and FCI McKean are barred by sovereign immunity; (ii) defendants LaManna, Dodrill, Lappin and Kendig should be dismissed because there is no allegation that the personally violated plaintiff's constitutional rights; and (iii) plaintiff cannot prove that his alleged exposure to ETS rises to the level of a constitutional violation. As for plaintiff's FTCA claims, they should be dismissed on the following grounds: (i) the United States is the only proper party to an FTCA claim; (ii) plaintiff's allegations fall squarely within the discretionary function exception to the FTCA; and (iii) plaintiff cannot demonstrate that he suffered an actual injury caused by secondhand smoke. Accordingly, the Court should dismiss plaintiff's Second Amended Complaint in its entirety with prejudice or, in the alternative, enter summary judgment in favor of defendants.

## FACTUAL BACKGROUND

### I.    THE PARTIES

Plaintiff is a federal inmate currently incarcerated at a federal prison in Ray Brook, New York. (*See* Public Information Data at 1 (attached as Exhibit 1a to Decl. of Rosalind Bingham).) On May 15, 1997, he was sentenced in the United States District Court for the District of Minnesota to 360 months imprisonment, to be followed by a ten (10) year term of supervised release, for Conspiracy to Distribute and Possess With Intent to Distribute Cocaine in violation of 21 U.S.C. §§ 846, and 841(b)(1)(A). (*See id.* at 2-3.) Plaintiff's sentence began on May 15,

1997, and he was designated to FCI McKean from July 8, 1997 until October 29, 2004.  (*See id.* at 1-2.)  Assuming that he receives all Good Conduct Time available, his projected release date is August 4, 2022.  (*See id.* at 3.)

Plaintiff named as defendants the "U.S. Justice Department," the Bureau of Prisons, and FCI McKean.  Plaintiff also named the following individuals (the "Individual Defendants"): John J. LaManna, Warden (former) of FCI McKean; D. Scott Dodrill, Regional Director, Federal Bureau of Prisons ("BOP"); Newton E. Kendig, Medical Director, BOP; and Harley G. Lappin, Director, BOP.

## II.    SMOKING REGULATIONS IN FEDERAL PRISONS

### A.    Smoking Policies From 1997 To 2004 – Under Which The Warden Had Discretion To Designate Smoking Areas

At the time plaintiff arrived at FCI McKean in 1997, smoking in federal prisons was governed by a regulation promulgated by the BOP on July 6, 1994 at 28 C.F.R. § 551.160, *et seq.,* and by BOP Program Statement 1640.03, Smoking/No Smoking Areas (July 1, 1994).  The regulation and Program Statement provided, in part that:

> All areas of Bureau of Prisons facilities and vehicles are no smoking areas unless specifically designated as a smoking area by the Warden as set forth in § 551.163.

28 C.F.R. § 551.162; *accord,* BOP Program Statement 1640.03, Smoking/No Smoking Areas (July 1, 1994), at p. 3 (attached as Exhibit 1d to Decl. of Rosalind Bingham).)  In turn, section 551.163 provided:

> (b)    At all low, medium, high, and administrative institutions other than medical referral centers, ***the Warden shall identify outdoor smoking areas and may, but is not required to, designate a limited number of indoor smoking areas*** where the needs of effective operation so require, especially

for those who may be employed in, or restricted to, a nonsmoking area for
an extended period of time.

(c)    **To the maximum extent practicable** nonsmoking inmates shall be housed
in nonsmoking living quarters.

28 C.F.R. § 551.163 (emphasis added); *accord*, BOP Program Statement 1640.03, Smoking/No

Smoking Areas (August 1, 1994), Ex. 1d, at pp. 3 and 5.

Additionally, smoking at FCI McKean was governed by an Institution Supplement, issued

on or about December 27, 1995, provided institution-specific guidance to staff and inmates at

FCI McKean.  (*See* Institution Supplement MCK 1640.02, Smoking and Non-Smoking Areas

(December 27, 1995) (attached as Exhibit 2a to Decl. of Monica Recktenwald).)  With respect to

designated smoking areas, Institution Supplement MCK 1640.2 provided:

(a)    Housing Units: Smoking is only permitted in inmate rooms as designated
by the Unit Manager of each Unit.  In the event that the inmate room is
assigned to one inmate smoker and one non-smoker, the room will be
designated a  non-smoking room.  There is no smoking in the TV rooms,
common areas, other multi-purpose areas or entrance-ways of the Housing Units.

(*Id.* at 1-2.)

Two years later, Institution Supplement MCK 1640.2 was superceded by Institution

Supplement MCK 1640.03, Smoking and Non-Smoking Areas (December 8, 1997) (attached as

Exhibit 2b to Decl. of Monica Recktenwald).)  But with respect to smoking in the Housing Units,

Institution Supplement MCK 1640.03 did not change the indoor designated smoking area policy.

(*See id.*, at pp. 1-2.)[1]

---

[1]The 1997 Institution Supplement on Smoking and Non-Smoking Areas was again
superceded four year later.  (*See* Institution Supplement MCK 1640.03, Smoking and Non-
Smoking Areas (June 21, 2002) (attached as Exhibit 2c to Decl. of Monica Recktenwald).)  This
new Institution Supplement did not change FCI McKean's smoking policy authorizing the Unit
Manager to designate smoking areas in the main institution.  (*See id.* at 1.)

**B.    Smoking Policies After 2004 – Prohibiting Indoor Smoking
And Restricting Outdoor Smoking**

On March 15, 2004, the BOP issued a new Program Statement that became effective on

July 15, 2004.  (*See* BOP Program Statement P1640.04, Smoking/No Smoking Areas (March 15,

2004), at p. 1 (attached as Exhibit 1f to Decl. of Rosalind Bingham).)  Under P1640.04, indoor

smoking for staff was limited to perimeter towers and perimeter patrol vehicles when occupied

by one person, and indoor smoking for inmates was limited to a designated area for observance

of authorized inmate religious activity.  (*See id.* at pp. 3-5.)  Accordingly, inmates were

prohibited from smoking indoors (other than as part of authorized religious activities), and were

permitted to smoke only in outdoor areas.  (*See id.* at 4-5.)

Consistent with P1640.04, the Warden of FCI McKean issued a memorandum to all staff

and inmates advising that no smoking would be permitted in any building as of July 15, 2004.

(*See* Memorandum from J. Sherman dated June 15, 2004 (attached as Exhibit 1d to Decl. of

Monica Recktenwald).)  It further stated that smoking would be permitted on the concrete pad

located outside of the housing units, and on the concrete pad between the education and health

services departments.  (*See id.*)   The Warden's memorandum also advised that on December 13,

2004, the commissary would no longer sell tobacco products, and that FCI McKean would be

"tobacco free" effective January 17, 2005.  (*Id.*)

On November 5, 2004, FCI McKean issued Institution Supplement 1640.04a, Smoking

and Non-Smoking Areas (November 5, 2004) (attached as Exhibit 2e to the Decl. of Monica

Recktenwald).  Under this new Institution Supplement 1640.04, all indoor designated smoking

areas were abolished.  (*See id.* at 1.)  Smoking was permitted by staff and inmates only in

outdoor designated smoking areas. (*See id.*) The Institution Supplement further specified that after January 17, 2005, inmates would no longer be permitted to smoke either indoors or outdoors. (*See id.*)

### C.  The Executive Order Referenced In The Second Amended Complaint Does Not Pertain To Federal Prisons

The Second Amended Complaint alleges that defendants Dodrill, Kendig, and Lappin "ignored [an] Executive Order declaring a cease and desist for smoking in all Federal Buildings." (Second Am. Compl., ¶ 12.) However, this allegation mischaracterizes Executive Order 13058, entitled "Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace," which was issued on August 9, 1997 to establish a smoke-free environment or federal employees and members of the public visiting or using federal facilities. *See* 62 Fed. Reg. 43451-2 (August 13, 1997) ("E.O. 13058"). Under E. O. 13058, the smoking of tobacco products was prohibited in all interior space owned, rented, or leased by the executive branch of the Federal Government, and in any outdoor areas under executive branch control in front of air intake ducts. 62 Fed. Reg. 43451.

Exempted from E.O. 13058 were "any residential accommodation for persons voluntarily or involuntarily residing, on a temporary or long-term basis, in a building owned, leased, or rented by the Federal Government." *Id.*, § 2(b). Indeed, the E.O. specifically directed that the Order would "not create any right to administrative or judicial review, or any other right or benefit, substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person or affect in any way the

liability of the executive branch under the Federal Tort Claims Act." *Id.,* § 8.  Accordingly, E.O.

13058 has no bearing on smoking policies in federal prisons.

### III.    PLAINTIFF'S HOUSING UNIT AT FCI MCKEAN

#### A.    There Is No Evidence That Plaintiff Was Assigned To A Smoking Room During The Time That He Was Incarcerated at FCI McKean

During his incarceration at FCI McKean (from July 8, 1997 through October 29, 2004),

plaintiff was housed in Unit 3 (later renamed as Unit C), except for about a month in which he

was assigned to the Special Housing Unit ("SHU").  (*See* Inmate Unit History (attached as

Exhibit 1e to Decl. of Rosalind Bingham); Decl. of Daniel Schneider, ¶ 1, n.1 (attached as

Exhibit 3); Decl. of Robert Reome, ¶ 1, n.1 (attached as Exhibit 4).)

In accordance with BOP Program Statement 1640.03 and FCI McKean's Institution

Supplements governing Smoking and Non-Smoking Areas (prior to the abolition of indoor

smoking areas), smoking was generally prohibited within plaintiff's housing unit.  (*See* Decl. of

Daniel Schneider, Ex. 3, ¶ 3; Decl. of Robert Reome, Ex. 4, ¶ 3.)   But as also provided by BOP

policy, plaintiff's Unit Managers designated the rooms on the upper tier – in which all roommates

were smokers – as smoking areas.  (*See* Institution Supplement MCK 1640.2, Smoking and Non-

Smoking Areas (December 27, 1995), Ex. 2a, at 1-2; Decl. of Daniel Schneider, Ex. 3, ¶ 3; Decl.

of Robert Reome, Ex. 4, ¶ 3.) [2]  To the extent possible, non-smoking inmates were not housed

---

[2]The decision to designate the inmate rooms on the upper tier as smoking rooms was based upon the fact that cigarette smoke rises.  Plaintiff's Unit Managers determined that non-smokers would be exposed to far less ETS if smoking were restricted to the rooms on the upper tier.  Also, because of the various missions of FCI McKean and the transient nature of the inmate population in general, it was impracticable to assign inmates to housing units based solely upon whether they smoked or were non-smokers.  (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 5; Decl. of Robert Reome, Ex. 4, ¶ 5.)

with smoking inmates.  And if a situation arose in which a smoker had to be housed with a
non-smoker, the room was designated as non-smoking.  (*See* Decl. of Daniel Schneider, Ex. 3, ¶
3; Decl. of Robert Reome, Ex. 4, ¶ 3.)

      Plaintiff's Quarters History reflects the following room assignments at FCI McKean:

-      July 8, 1997 through May 20, 1998 – exact location of assigned bed unavailable;[3]

-      May 20, 1998 through August 24, 1998 -- lower tier;[4]

-      August 24, 1998 through September 18, 1998 -- SHU;[5]

-      September 18, 1998 through July 20, 2004 -- lower tier;

-      July 20, 2004 through October 29, 2004 -- upper tier[6]

(*See* Inmate Quarters History (attached as Exhibit 1g to Decl. of Rosalind Bingham).)

### B.    Enforcement Of BOP Smoking Policies Within Plaintiff's Housing Unit

      While plaintiff was incarcerated at FCI McKean, his housing unit was staffed during
regular working hours by the members of his unit team, consisting of one Unit Manager, two

---

[3]Until sometime in 1998, inmate quarters history for inmates at FCI McKean was
maintained only by housing unit divisions; inmate rooms were not specifically listed in the
quarters history.  Accordingly, the exact room assignment for plaintiff cannot be determined until
1998, when FCI McKean started including room assignments for all inmates incarcerated at that
institution.  (*See* Decl. of Monica Recktenwald, ¶ 3 (attached as Exhibit 2).)

[4]At FCI McKean, all rooms on the 100 level are located on the lower tier, and all rooms
on the 200 level are upper tier rooms.  (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 3; Decl. of Robert
Reome, Ex. 4, ¶ 3.)

[5]Although there were designated indoor smoking areas for inmates assigned to rooms in
general population, there were no designated indoor smoking areas for inmates assigned to the
SHU.  (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 7; Decl. of Robert Reome, Ex. 4, ¶ 7.)

[6]As discussed, FCI McKean abolished all indoor smoking areas effective on July 15, 2004
– five days before he was assigned to a room on the upper tier.  (*See* Memorandum from
J. Sherman dated June 15, 2004, Ex. 1d.)

Case Managers, two Correctional Counselors and one unit secretary. (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 4; Decl. of Robert Reome, Ex. 4, ¶ 4.) In addition, numerous members of the institution executive staff and various support staff from other departments within FCI McKean had occasion to enter and conduct business within the housing unit during regular working hours. (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 4; Decl. of Robert Reome, Ex. 4, ¶ 4.) Plaintiff's housing unit was also staffed 24 hours each day by two Unit Officers – with one of each specifically assigned to half of the housing unit (identified as the "A" and "B" sides). (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 4; Decl. of Robert Reome, Ex. 4, ¶ 4.) Each Unit Officer assigned to plaintiff's housing unit was responsible for patrolling his specific side of the unit, accounting for inmates assigned to the unit, and tending to safety and security needs for all staff and inmates assigned to that particular side of the unit.

All staff within the housing unit were responsible for ensuring that institution rules and regulations were enforced. Among the rules enforced by the institution staff while working within Unit 3 was the rule governing designated smoking areas. (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 4; Decl. of Robert Reome, Ex. 4, ¶ 4.) If staff observed inmates smoking in non-designated areas, they could address the situation either informally, by reminding inmates of the rules and issuing warnings, or formally, by issuing incident reports. Also, if an inmate observed another inmate smoking in a non-smoking area, the inmate could report the smoking inmate to staff so appropriate action could be taken. (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 4; Decl. of Robert Reome, Ex. 4, ¶ 4.) If staff found evidence that an inmate was smoking in a non-smoking area, efforts would be made to reassign the inmate to a room on the upper tier, and

away from the non-smoking inmates. (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 4; Decl. of Robert

Reome, Ex. 4, ¶ 4.)

## IV.    PLAINTIFF'S PRISON MEDICAL RECORDS

The medical care that plaintiff received at FCI McKean is summarized in the declaration

on Dawn Marini, M.D., Clinical Director of FCI Ray Brook, and as set forth below. (*See* Decl.

of Dawn Marini, M.D., ¶¶ 2-3 (attached as Exhibit 5); *see also* Plaintiff's Prison Medical Records

(attached as Exhibit 5a to Decl. of Dawn Marini, M.D.).) As these summaries demonstrate,

plaintiff has never complained of any illness related or allegedly related to secondhand smoke:

•    During intake screening examinations at the Federal Transfer Center ("FTC") in

Oklahoma City, Oklahoma on June 19, 1997, and the United States Penitentiary ("USP") in

Lewisburg, Pennsylvania on June 30, 1997, plaintiff reported that he had a history of marijuana

use. (*See* Plaintiff's Prison Medical Records, Ex. 5a, at pp. 27, 29.) He denied a history of

dizziness or fainting spells, ear, nose or throat trouble, chronic or frequent colds, sinusitis, skin

diseases, shortness of breath, pain or pressure in his chest, chronic cough, palpitation or pounding

heart, indigestion or recent gain or loss of weight. (*See id.*)

•    Upon plaintiff's admission to FCI McKean on July 8, 1997, plaintiff denied that

he had any suicidal thoughts or that he was taking any medications at that time. (*See* Decl. of

Dawn Marini, M.D., Ex. 5, ¶ 3a; Plaintiff's Prison Medical Records, Ex. 5a, at p. 7.)

•    On July 14, 1997, plaintiff reported a fungal infection of his toe and nail. After an

examination, he was assessed with fungal infection and given treatment and education. (*See*

Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3b; Plaintiff's Prison Medical Records, Ex. 5a, at pp. 7,

14.)  Plaintiff was also examined on July 16, 1997.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3c; Plaintiff's Prison Medical Records, Ex. 5a, at p. 7.)

•        During a medical examination at FCI McKean on July 16, 1997, plaintiff indicated that he was a non-smoker.  (*See* Plaintiff's Prison Medical Records, Ex. 5a, at pp. 7, 15 22.)  He was also examined and found to have normal nose, sinuses, mouth and throat, lungs and chest, heart, abdomen and viscera.  (*See id.* at 21.)

•        On September 19, 1997, plaintiff sustained a superficial wound to his hand at his inmate work assignment.  The wound was cleaned and a butterfly bandage and band-aid were applied to the wound.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3d; Plaintiff's Prison Medical Records, Ex. 5a, at pp. 7, 31.)

•        During a bi-annual physical examination at FCI McKean on July 9, 2003, plaintiff's vital signs were taken, and he denied any medical complaints or changes since his most recent physical examination on July 16, 1997.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3e; Plaintiff's Prison Medical Records, Ex. 5a, at p. 5.)

•        Upon his transfer to FCI Ray Brook on November 4, 2004, plaintiff completed a medical history survey, in which he now denied any history of marijuana use.  (*See* Plaintiff's Prison Medical Records, Ex. 5a, at pp. 3, 25.)  He also denied a history of dizziness or fainting spells, ear, nose or throat trouble, chronic or frequent colds, sinusitis, skin diseases, shortness of breath, pain or pressure in his chest, chronic cough, palpitation or pounding heart, indigestion or recent gain or loss of weight.  (*See id.* at 25.)

•      On March 1, 2005, plaintiff reported staph exposure.  He was assessed with status post staph exposure, but not treated at that time.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3f; Plaintiff's Prison Medical Records, Ex. 5a, at p. 3.)

•      During an annual food handler's examination on March 2, 2005, plaintiff presented none of the following:  acute or chronic inflammatory conditions of the respiratory system; acute or chronic infections, skin diseases, or open sores; acute or chronic intestinal infections; any communicable diseases.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3g; Plaintiff's Prison Medical Records, Ex. 5a, at p. 2.)

•      On October 25, 2005, plaintiff complained of a cold sore on his upper lip with hyper-pigmentation for one week.  After an examination, he was assessed with herpes simplex virus I, and hyper-pigmentation lesion.  He was educated regarding his condition.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3h; Plaintiff's Prison Medical Records, Ex. 5a, at p. 1.)

•      Plaintiff reported he was seen at sick call on January 9, 2006 for a rash on his stomach and arms.  After a physical examination, the Clinical Director was consulted.  Plaintiff was educated and given treatment.  (*See* Decl. of Dawn Marini, M.D., Ex. 5, ¶ 3i; Plaintiff's Prison Medical Records, Ex. 5a, at p. 1.)

## PROCEDURAL HISTORY

Plaintiff filed his Complaint in this action on December 28, 2004, asserting a claim under the FTCA, for personal injuries allegedly caused by exposure to ETS at FCI McKean.  Specifically, plaintiff alleged that the levels of secondhand smoke at FCI McKean caused him to suffer a litany of illnesses including nausea, "the inability to eat," headaches, chest pains, difficulty breathing, numbness in limbs, teary eyes, itching, burning skin, dizziness, sore throat,

coughing and production of sputum.  (*See* Compl., ¶ 27.)  He also alleges that he has recently lost

hair follicles, his skin has become discolored, he has hardening lumps, blurred vision and

nervousness.  (*See id.*)  As relief, plaintiff sought a declaratory judgment and compensatory

damages in the amount of $10 million.  He also sought an injunction that prohibits, *inter alia*,

defendants or their agents "from harassing, threatening, punishing or retaliating in any way

against the Plaintiff because they filed this action or against any other prisoners because they

submitted affidavits in this case on behalf of Plaintiff."  (*Id.* at Wherefore Cl., ¶ 3(f).)[7]

On January 3, 2006, the United States of America filed a Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment, as well as a Motion for Substitution of Party, and a

Motion to Strike Demand for Trial by Jury.  (*See* Docket Nos. 46-51.)  In response, plaintiff filed

a number of documents, including a "Motion for Preliminary Injunction with Affidavit to

Support Against Retaliation" and a "Motion to Second Amend Complaint."  (*See* Docket Nos. 62

and 64.)  After plaintiff's motion for preliminary injunction was denied by this Court as moot,

and that decision was affirmed by the district court, plaintiff filed a Notice of Appeal to the Court

of Appeals for the Third Circuit.  (*See* Docket Nos. 67, 69 and 73.)

In the meantime, plaintiff was granted leave to file a Second Amended Complaint.  (*See*

Docket Nos. 71-72.)  In his Second Amended Complaint, plaintiff added a *Bivens* claim alleging

that the Individual Defendants violated his rights under the Eighth and Fourteenth Amendments

to the Constitution.  (*See* Second Am. Compl., ¶¶ 10-14.)  However, plaintiff's Second Amended

Complaint does not allege any damages, or indicate that plaintiff continues to assert a claim for

---

[7]Plaintiff subsequently filed a Motion to Amend Complaint Correcting Typographical
Error and Adding Cure to Jurisdictional Deficiency, which was granted by Order dated May 9,
2005.  (*See* Docket No. 7.)

retaliation based on his filing of this lawsuit or his filing of administrative remedies or administrative tort claims. (*See id.*) Because plaintiff appealed the denial of his motion for preliminary injunction, defendants were not required to file their dispositive motion and/or responsive pleading until after plaintiff's appeal was dismissed on December 14, 2006. (*See* Docket No. 82.)

## APPLICABLE LEGAL STANDARDS

### I.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

The party asserting the existence of federal jurisdiction bears the burden of proving that jurisdiction over the subject matter actually exists. *Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines,* 673 F.2d 700, 711 n.16 (3d Cir. 1982); *Shepherdson v. Local Union No. 401,* 823 F. Supp. 1245, 1248 (E.D. Pa. 1993). When considering a challenge to a court's jurisdiction under Fed. R. Civ. P. 12(b)(1), a court ordinarily need not limit its inquiry to the facts as pled in the complaint. *Land v. Dollar,* 330 U.S. 731, 735 (1947). Rather, "[t]he court may inquire by affidavits or otherwise, into the facts as they exist." *Id.* at 735 n.4. Such inquiry is permissible because a federal court must assure itself that it has jurisdiction over the case, and it may even resolve factual disputes in doing so. *See Boyle v. The Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 74 (3d Cir. 1991) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)).

### II.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

A motion to dismiss under Rule 12(b)(6) is the appropriate method by which to challenge the legal sufficiency of claims in a complaint. *See* Fed. R. Civ. P. 12(b)(6); *Raines v. Haverford College*, 849 F. Supp. 1009, 1010 (E.D. Pa. 1994). Although courts reviewing Rule 12(b)(6)

motions generally consider only the allegations in the complaint, courts are also free to examine

any attached exhibits, other undisputed documents relied on by the plaintiff, other items

appearing in the record of the case, and matters of public record.  *Raines*, 849 F. Supp. at 1019;

*see also Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994).

Indeed, if a court could not consider such documents, "`a plaintiff with a legally deficient claim

could survive a motion to dismiss simply by failing to attach a dispositive document upon which

[he] relied.'" *Interfaith Community Org. v. AlliedSignal, Inc.*, 928 F. Supp. 1339, 1345 (D.N.J.

1996) (quoting *Dykes v. Southeastern Pa. Trans. Auth.*, 68 F.3d 1564, 1567 n.3 (3d Cir. 1995)).

While courts considering motions to dismiss have a limited role, these courts should grant

such motions where it is clear that no relief could be granted under any set of facts that are

consistent with the allegations of a complaint.  *AlliedSignal*, 928 F. Supp. at 1346.  The issue is

not whether the plaintiff will ultimately prevail, but whether the plaintiff has any chance of doing

so.  *Id.; Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## III.    MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper if there is no genuine issue of material fact and the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  That is, Rule 56(c)

"mandates the entry of summary judgment . . . against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The plaintiff cannot merely rest on allegations in his complaint.  *Id.* at 324.  To defeat a motion

for summary judgment, "the nonmoving party must adduce more than a mere scintilla of

evidence in his favor." *Williams v. Borough of Chester,* 891 F.2d 458, 460 (3d Cir. 1989).

## ARGUMENT

**I.    ANY OF PLAINTIFF'S CLAIMS ACCRUING BEFORE DECEMBER 28, 2002 ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATIONS**

To the extent that they are based on conduct that occurred over two years before he filed this lawsuit, plaintiff's *Bivens* and FTCA claims are both untimely.  Beginning with plaintiff's *Bivens* claims, the applicable statute of limitations is the state statute of limitations for personal injury claims.  *See Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1087-88 n.3 (3d Cir.1988).  Pennsylvania, in turn, provides a two year limitations period for personal injury actions.  *See* 42 Pa. Cons. Stat. Ann. § 5524.  Because plaintiff filed this lawsuit on December 28, 2004, the statute of limitations bars his *Bivens* claims to the extent that they are based on conduct taking place more than two years before that date – *i.e.,* before December 28, 2002.

As for plaintiff's FTCA claims, the statute specifically requires a claimant to file an administrative claim with the appropriate federal agency prior to commending suit in federal court.  *See* 28 U.S.C. § 2675(a); *Reo v. U.S. Postal Serv.*, 98 F.3d 73, 75 (3d Cir. 1996) (explaining that under administrative system established by the FTCA, "[t]he claimant is required to file a claim with the agency allegedly responsible for her injuries.").  Like plaintiff's *Bivens* claims, the FTCA further provides that such exhaustion must occur within two years of the "accrual" of a plaintiff's cause of action: "A tort claim against the United States ***shall be forever barred*** unless it is presented in writing to the appropriate Federal agency ***within two years after such claim accrues*** . . . ."  28 U.S.C. § 2401(b) (emphasis added); *see United States v. Kubrick,* 444 U.S. 111, 113 (1979) (applying statute of limitations in FTCA action).  Accordingly,

plaintiff's FTCA claims should also be dismissed as untimely, to the extent that they are based on conduct that took place before December 28, 2002.[8]

## II.    PLAINTIFF'S *BIVENS* CLAIMS SHOULD BE DISMISSED

### A.    Plaintiff's Constitutional Claims Against The "U.S. Justice Department," The BOP And FCI McKean Are Barred By Sovereign Immunity

Public entities are not subject to personal liability lawsuits under *Bivens*.  *See Johnstone v. United States,* 980 F. Supp. 148, 151 (E.D. Pa. 1997) (explaining that *Bivens* actions "may only be maintained against federal officers; sovereign immunity bars such actions against the United States or agencies thereof.").  It is well-settled that the United States a nd its agencies are entitled to sovereign immunity from suit, and an action for damages may not be brought against the United States unless it waives sovereign immunity.  *See, e.g., F.D.I.C. v. Meyer,* 510 U.S. 471, 477-78 (1994).  Although the Supreme Court clarified in *Bivens* that a plaintiff may assert a claim directly under the United States Constitution against a federal agent, that decision is a judicial creation that authorizes suits only against a responsible federal agent.  *Keene Corp. v. United States*, 700 F.2d 836, 845 n. 13 (2d Cir. 1983).  *Bivens* does not waive the sovereign immunity of the federal government, and *Bivens*-type actions against federal entities are routinely

---

[8]Plaintiff's Second Amended Complaint does not appear to reassert a claim for retaliation based on filing this lawsuit or for filing administrative remedies or administrative tort claims regarding ETS exposure.  But to the extent that plaintiff intends to assert such a claim, it should fail because plaintiff failed to exhaust any such claim in his administrative remedies or administrative tort claims.  (*See* Administrative Remedy, Case No. 321868 (attached as Exhibit 1b to Decl. of Rosalind Bingham); Administrative Tort Claim Case No. TRT-NER-2004-01684 (attached as Exhibit 1c to Decl. of Rosalind Bingham)); *see* 28 U.S.C. § 2675(a) (requiring exhaustion under FTCA); 42 U.S.C. § 1997e (requiring exhaustion under Prisoner Litigation Reform Act ("PLRA")).

dismissed for lack of subject-matter jurisdiction. *See Johnstone*, 980 F. Supp. at 151; *Gagliardi v. United States*, No. 89-8859, 1991 WL 9361, at *5 (E.D. Pa. Jan. 28, 1991).

To the extent that plaintiff attempts to assert constitutional claims against the "U.S. Justice Department," the BOP and FCI McKean, the federal government has not waived sovereign immunity in this context. Thus, the Court lacks jurisdiction over any *Bivens* claims against these sovereign entities.

> ### B.    The Individual Defendants Should Be Dismissed Because There Is No Allegation That They Personally Violated Plaintiff's Constitutional Rights

Plaintiff sued defendants LaManna, Dodrill, Kendig and Lappin on the basis that they permitted the BOP's smoking policies to be carried out at FCI McKean. (*See* Second Am. Compl., ¶¶ 11-14.) Plaintiff also complains that these defendants denied his administrative remedy and administrative tort requests. (*See id.*) Such claims, however, amount to nothing more than *respondeat superior* liability. And it is well-settled that such a theory may not form the basis for liability under *Bivens*. *Balter v. United States,* 172 Fed. Appx. 401, 403 (3d Cir. 2006); *Francis v. Dodrill,* No. 3:04CV1694, 2005 WL 2216582, at *2, n.3 (M.D. Pa. Sept. 12, 2005); *see Rode v. Dellarciprete,* 845 F.2d 1195, 1208 (3d Cir. 1988) (finding in § 1983 action that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior.").

Accordingly, to hold an individual supervisor liable under *Bivens*, a plaintiff must demonstrate either that the defendant was personally involved in the constitutional violation or had actual knowledge of and acquiesced to a subordinate's violation. *See Rode,* 845 F.2d at 1207. "Allegations of participation or actual knowledge and acquiescence, however, must be

made with appropriate particularity." *Id.* Plaintiff has made no such allegations here against the Individual Defendants. Accordingly, plaintiff's *Bivens* claims against defendants LaManna, Dodrill, Lappin and Kendig should be dismissed.

### C. Plaintiff Cannot Prove That His Alleged Exposure To Secondhand Smoke Rises To The Level Of A Constitutional Violation

In *Helling v. McKinney*, 509 U.S. 25, 35 (1993), the Supreme Court held that a cause of action exists under the Eighth Amendment when a prisoner alleges that prison officials have exposed him, with deliberate indifference, to levels of ETS. In doing so, the Court established a two-part test that a plaintiff must satisfy to state a valid Eighth Amendment claim. The first prong is objective and requires the plaintiff to show that "he himself is being exposed to **unreasonably high** levels of ETS." *Id.,* at p. 35 (emphasis added). Also with respect to this prong, the Eighth Amendment requires a court to make not only a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to the contaminant, but also "to assess whether society considers the risk that the prisoner complain of to be so grave that it violates contemporary standard of decency to expose **anyone** unwillingly to such a risk." *Id.* at 36 (emphasis in original).

The second prong is a subjective one, and requires the plaintiff to show that prison officials were deliberately indifferent to a serious risk of harm. *Id.* Indeed, the Supreme Court has previously held that:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts for which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

In this case, plaintiff alleges that he was exposed to ETS in his housing unit at FCI McKean. Plaintiff has presented no evidence, however, to establish either prong of the *Helling* test. Specifically, plaintiff has not shown he was exposed to "unreasonably high" levels of ETS or that defendants exhibited deliberate indifference to such exposure.

       **1.**     ***Plaintiff Cannot Establish That He Was Actually Exposed To "Unreasonably High Levels" Of ETS***

When analyzing whether the objective prong of the *Helling* test has been established, courts look to the evidence that a plaintiff has provided about the level of smoke in the facility, the degree of exposure, or any medical problems associated with exposure to ETS. *See Helling*, 509 U.S. at 35 (finding summary judgment inappropriate where plaintiff was housed with a five-packs-per-day smoker and contended he developed ETS-related health problems); *see also Davidson v. Coughlin,* 920 F.Supp. 305 (N.D.N.Y. 1996) (inmate's unsupported allegations of ETS-related health problems insufficient to survive summary judgment); *Gill v. Smith,* 283 F. Supp. 2d 763 (summary judgment inappropriate where the plaintiff provided medical records to show he has asthma and has suffered asthma attacks after being exposed to ETS); *LaCroix v. Williams,* 2000 WL 1375737 (W.D.N.Y.) (plaintiff's allegation that he was housed in poorly ventilated, 22 bed dormitory which he shared with 21 smokers is insufficient to support Eighth Amendment claim when no documentation to support the alleged resulting medical problems).

For example, in *Baker v. Williams,* 2002 WL 31015630 (D. Del., Sept. 10, 2002), the court granted summary judgment in favor of state correctional officials in a case filed by a state inmate who claimed that he was exposed to unreasonably high levels of ETS in violation of his

Eighth Amendment rights.  The plaintiff in that case provided an affidavit stating that he was exposed to "cloudy," "very smoky" conditions, as well as a chart detailing the time of day and the number of inmates smoking at any given time over the course of a five-day period.  He also produced affidavits from several other inmates in support of his claims.  However, the court granted summary judgment in favor of the defendants because, even if the plaintiff had shown that he was subject to some level of ETS, he had not "provid[ed] competent evidence as to the level of ETS."  *Id.*  Accordingly, the court found that the plaintiff failed to meet the first element of the *Helling* test, *i.e.,* that he show his exposure to a toxin "created a risk [that] is so grave that if violates contemporary standards of decency to expose anyone unwillingly to such a risk."  *Id.* (quoting *Helling,* 509 U.S. at 36).  *See also Griffin v. DeRosa,* 153 Fed. Appx. 851 (3d Cir. 2005) (dismissal under 28 U.S.C. §§ 1915(e)(2) and 1915 (b)(1) appropriate where inmate alleged that over a period of twenty months he was exposed to ETS in inadequately ventilated restrooms, where he claimed that every time he used the restroom, at least eight to ten inmates were smoking there); *Perez v. Holman,* 2001 WL 984868 (D. Del, Aug. 29, 2001) (granting the defendants' motion for summary judgment in *Bivens* action alleging excessive ETS exposure where inmate failed to present competent evidence number of smoking inmates with whom he came into contact, the frequency they smoked, or the seriousness of his medical condition).

Like the plaintiff in *Baker*, plaintiff here cannot show that he was exposed to a level of ETS that created a risk so grave as to violate contemporary standards of decency.  Specifically, plaintiff commenced service of his federal sentence at FCI McKean on July 8, 1997.  Between that date and December 29, 2006, plaintiff sought medical attention on only eight separate occasions.  (Plaintiff's Prison Medical Records, Ex. 5a, at pp. 1-8.)  Of these encounters with

Health Services staff, none was associated with ETS exposure, asthma, or other respiratory conditions. (*See id.*) Moreover, plaintiff's medical records demonstrate that he denied having any ailments associated with or allegedly associated with secondhand smoke, including ear nose or throat trouble, chronic cough or sinusitis. (*See id.*, at pp. 25, 27 and 29.)

Further, the available evidence indicates plaintiff did not submit any written complaints regarding ETS until December 25, 2003. (*See* Administrative Remedy, Case No. 321868, Ex. 1b, at pp. 1-2.) At the time plaintiff filed his informal resolution form regarding ETS, as well as the five and one half years preceding the filing of that claim, plaintiff was assigned to a room in the ***non-smoking*** section of his housing unit. (*See id.* at pp. 2, 4, 7, and 10.) Also, by the time he was assigned a room in the upper tier, all indoor designated smoking areas had been abolished (with the exception of religious-based smoking). (*See* BOP Program Statement P1640.04, Smoking/No Smoking Areas (March 15, 2004), Ex. 1f, at p. 1; Memorandum from J. Sherman dated June 15, 2004, Ex. 1d.)

It is well-settled that prisons are not under a duty to provide a maximally safe environment, completely free from pollution or safety hazards. *See Carroll v. DeTella,* 255 F.3d 470, 472 (7th Cir. 2001). In *Carroll*, the Seventh Circuit opined that because many Americans live under conditions of exposure to various contaminants, the Eighth Amendment does not require prisons to provide prisoners with "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Id.* (internal citations omitted).

Because plaintiff has failed to establish he was exposed to excessive levels of ETS at FCI McKean, his Eighth Amendment claim should be dismissed.

### 2.     *Plaintiff Cannot Establish Deliberate Indifference By Defendants*[9]

Even assuming that plaintiff could satisfy the objective portion of the *Helling* Eighth

Amendment test, he cannot show the second, subjective portion of the test. Under this factor, a

plaintiff must prove that the defendants knew that he faced a substantial risk of serious harm and

disregarded that risk by failing to take reasonable measures to prevent or diminish it. *See*

*Farmer,* 511 U.S. 825, 847 (1994); *Bacon v. Taylor*, 414 F. Supp. 2d 475, 480 (D. Del. 2006).

There is no such evidence in this case.

In the context of an inmate's ETS claim, a plaintiff must establish that he has a serious

medical need for a smoke-free environment, *see Hunt v. Reynolds*, 974 F.2d 734, 735 (6th Cir.

1992), or that, regardless of health, the level of ETS in the prison creates an unreasonable risk of

serious damage to his future health. *See Helling,* 509 U.S. at 35-36; *Morris v. Lorillard,* 2006

WL 2796029, C.A. No. 1:04-CV-2617 (M.D. Pa., September 25, 2006). In *Helling*, the Supreme

Court noted that "the adoption of a smoking policy . . . will bear heavily on the inquiry into

deliberate indifference." 509 U.S. at 36.

As already discussed at length, the BOP Program Statements, FCI McKean's Institution

Supplements and the June 15, 2004 memorandum from Warden LaManna establish that the BOP

---

[9]Pursuant to the PLRA,"[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correction facility, for mental or emotional injury suffered while in custody without a ***prior showing of physical injury***." 42 U.S.C. § 1997e(e) (emphasis added). *Mitchell v. Horn*, 318 F.3d 523, 533-36 (3d Cir. 2003) (explaining that section 1997e(e) "predicates a prisoner's claim for mental or emotional injury suffered while in custody on a showing of accompanying physical injury."); *see also Davis v. District of Columbia,* 158 F.3d 1342, 1345-48 (D.C. Cir. 1998) (upholding constitutionality of physical injury requirement of section 1997e(e)). As discussed herein, plaintiff's medical record indicates that, to date, he has not reported any ETS-related health problems or injuries. Therefore, his *Bivens* claim relating to ETS exposure should also be dismissed pursuant to the PLRA, 42 U.S.C. § 1997e(e).

and FCI McKean had smoking policies in place throughout plaintiff's incarceration at FCI McKean. (*See, e.g.*, BOP Program Statement P1640.04, Smoking/No Smoking Areas (March 14, 2004), Ex. 1f, at p. 1.) In accordance with these policies, plaintiff's Unit Managers limited smoking in plaintiff's housing units to rooms located in the upper tier of the housing unit when such rooms were assigned to smoking inmates only. (*See* Decl. of Daniel Schneider, Ex. 3, ¶ 3; Decl. of Robert Reome, Ex. 4, ¶ 3.) Per institution policy, if an upper tier room were assigned to both a smoking and a non-smoking inmate, the room would not be designated as a non-smoking room. (*See, e.g.,* Institution Supplement MCK 1640.02, Smoking and Non-Smoking Areas, Ex. 2a (December 27, 1995).)

The record shows that plaintiff was assigned to cells in non-smoking sections of FCI McKean (either in his housing unit or in SHU) from at least May 20, 1998 until FCI McKean abolished all indoor smoking areas effective July 15, 2004. Further, the evidence shows that when plaintiff was incarcerated at FCI McKean, he presented no health issues associated with ETS. Although plaintiff accessed the administrative remedy process, he requested only that FCI McKean determine inmate housing assignments based upon whether they were smokers or non-smokers. (*See* Administrative Remedy, No. 321868, Ex. 1b.) Absent from plaintiff's administrative remedy filings was any indication as to the amount of ETS to which he was exposed. (*See id.*)

The decision to permit smoking within the housing units was a calculated decision of the Warden of FCI McKean, based upon his knowledge of past practices, the hazards associated with ETS, the fact that many staff and inmates at FCI McKean were smokers and/or had tobacco addiction issues. (*See* Decl. of John J. LaManna, ¶ 9 (attached as Exhibit 6).) FCI McKean's

policy may have resulted in some exposure to ETS; however, as previously discussed, more than mere exposure is necessary to establish deliberate indifference. *See Helling,* 509 U.S. at 35.

As noted earlier, the adoption of a smoking policy will bear heavily on the inquiry into deliberate indifference. *Helling,* 509 U.S. at 36. Imperfect enforcement of the policy does not equate to deliberate indifference. *See Franklin v. District of Columbia,* 163 F.3d 625, 636 (D.C. Cir. 1998). Therefore, while the system may not be perfect, and inmates may flout the rules, plaintiff cannot show that correctional staff were deliberately indifferent to enforcing the no smoking policies. Accordingly, plaintiff's *Bivens* claims should be dismissed.[10]

## III.    PLAINTIFF'S FTCA CLAIMS SHOULD BE DISMISSED

### A.    The United States Is The Only Proper Party To An FTCA Claim

As sovereign, the United States is immune from suit except as it consents to be sued, and the terms of its consent, as set forth by Congress, define the limits of the federal courts' subject matter jurisdiction to decide suits brought against the United States. *United States v. Sherwood,* 312 U.S. 584, 586 (1941); *see also United States v. Mitchell,* 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). The FTCA creates a limited waiver of sovereign immunity for claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b); *see generally, United States v. Orleans,* 425 U.S. 807, 813 (1976) (limited waiver).

---

[10]Although not necessary for purposes of this motion, the Individual Defendants are also entitled to protection from suit under the doctrine of qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 817-18 (1982).

Because the FTCA's waiver of sovereign immunity extends only to the United States – and not its employees or specific federal agencies – the United States is the only proper defendant in an action brought under the FTCA.  *See, e.g., Kennedy v. United States Postal Serv.*, 145 F.3d 1077, 1078 (9th Cir. 1998) (per curiam) (affirming dismissal of Postal Service in FTCA action because the United States is the only proper defendant in such an action); *Allgeier v. United States,* 909 F.2d 869, 871 (6th Cir. 1990) ("The FTCA clearly provides that the United States is the only proper defendant in a suit alleging negligence by a federal employee."); *Mars v. Hanberry*, 752 F.2d 254, 255 (6th Cir. 1985) ("The United States is the only proper party in an action pursuant to the [FTCA], and the FTCA does not grant federal courts jurisdiction over actions against individual defendants such as employees.") (internal citations omitted); *McNiff v. Asset Management Specialists, Inc.,* 337 F. Supp. 2d 685, 691 (E.D. Pa. 2004) ("It is well-settled that the United States of America is the only proper party in a suit pursuant to the Federal Tort Claims Act.").  Accordingly, this Court should dismiss plaintiff's FTCA claims.

### B.    Decisions Made By Prison Officials Regarding Smoking Within A Prison Facility Fall Within The Discretionary Function Exception To The FTCA

Even assuming that plaintiff had named the correct party to his FTCA claim, the United States should be dismissed based on sovereign immunity.  As sovereign, the United States is immune from suit except as it consents to be sued, and the terms of its consent, as set forth by Congress, define the limits of the federal courts' subject matter jurisdiction to decide suits brought against the United States.  *United States v. Sherwood,* 312 U.S. 584, 586 (1941); *see also United States v. Mitchell,* 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for

jurisdiction."). The FTCA creates a limited waiver of sovereign immunity for claims against the United States only for the negligence of its officers or employees acting within the scope of their employment. *See* 28 U.S.C. § 1346(b); *see generally, United States v. Orleans*, 425 U.S. 807, 813 (1976) (limited waiver).

There are, however, exceptions to this waiver of sovereign immunity. The discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), is perhaps the most important of these exclusions to the United States' liability under the FTCA. Specifically, the discretionary function exception expressly states that the FTCA does not apply to the following:

> any claim based upon an act or omission of an employee of the Government exercising due care, in the execution of a statute or regulation . . . or ***based on the exercise or performance or the failure to exercise or perform a discretionary function or duty*** on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (emphasis added). The purpose of the exception is to prevent "judicial second-guessing of legislative and administrative decisions that are grounded in social, economic, and political policies through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323, (1991) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). When claims fall within the discretionary function exception, the United States cannot be held liable, as it has not waived its sovereign immunity for such claims, and the courts therefore lack subject matter jurisdiction over the claims. *Montez v. U.S.*, 359 F.3d 392, 395 (6th Cir. 2004); *Alfrey v. U.S.*, 276 F.3d 557, 561 (9th Cir. 2002).

The United States Supreme Court has formulated a two-part test for determining whether a government act falls within the discretionary function exception to FTCA liability. *See Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988); *Gaubert*, 499 U.S. at 322-23 (1991).

-27-

Under this test, a court must first determine whether the conduct involved an element of judgment or choice by the employee. *See Gaubert,* 499 U.S. at 322. "The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Id.* (internal quotation omitted). If, however, there is no statute, regulation, or policy that specifically prescribes a course of action, and the employee's conduct is the product of judgment or choice, the first prong of the *Berkovitz-Gaubert* test is satisfied. Such judgment is involved in the "day-to-day management decisions" that require a choice between a range of permissible alternative courses. *Scrima v. Hasty,* No. 97-CIV. 8433, 1998 WL 661478, at *2 (S.D.N.Y. Sept. 24, 1998).

If the challenged act satisfies this first requirement, a court must then proceed to the second part of the test, which requires a determination as to whether the employee's judgment or choice is of the kind that Congress intended to shield from FTCA liability; that is, if it was grounded in social, economic, and political policy. *Berkovitz*, 486 U.S. at 536; *Gaubert*, 499 U.S. at 322-23; *Gollehon Farming v. United States*, 17 F. Supp. 2d 1145, 1154 (D. Mont. 1998). Discretionary acts are protected from liability if they are within the range of choice accorded by federal policy and law and are the results of policy determinations. *Varig Airlines*, 467 U.S. at 820. Additionally, if a regulation gives an employee discretion, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation" is

inextricably intertwined with the policy considerations which lead to the creation of the regulation. *Gaubert*, 499 U.S. at 324.[11]

Courts have further clarified that when determining whether government action is grounded in considerations of policy, the focus is not on whether the government employee involved ***actually*** weighed social, economic, or political policy considerations before acting. *Ochran v. United States*, 117 F.3d 495, 499 (11th Cir. 1997). Rather, the focus is on the general nature of the judgment involved and whether it may be "susceptible to policy analysis." *Id.* (quoting *Gaubert*, 499 U.S. at 325). A "policy analysis" may include the weighing of competing interests or the examination of economic constraints in light of the needs of the public. *Gollehon Farming*, 17 F. Supp. 2d at 1154.

The operation of a federal prison involves a wide range of social and economic considerations, with social concerns and considerations that are markedly different from the issues that arise in the operation of any other organization. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977). The Supreme Court has repeatedly recognized that broad deference should be afforded to the discretion exercised by prison administrators in adopting and executing policies and practices which address the day-to-day problems in operating a corrections facility. *See, e.g., Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

_____

[11] Once a particular function is found to be discretionary, a negligence claim will fail, even if the BOP abused its discretion or was negligent in the performance of its discretionary functions. *Bailor v. Salvation Army*, 51 F.3d at 685; *see, e.g., Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 795-97 (8th Cir. 1998) (no claim under FTCA for BOP's alleged negligence in failing to protect inmate from assault by another inmate because a decision whether to place an inmate in protective custody is the exercise of a discretionary function).

The duty of care owed by the BOP to the inmate population is broadly set forth at 18 U.S.C. § 4042, which requires only that the BOP must provide "suitable quarters and provide for the safekeeping, care, and subsistence of all [federal inmates]." "While it is true that the statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) (affirming application of discretionary function exception to FTCA). The absence of specific guidelines for appropriate conduct in administering these duties, therefore, leaves judgment or choice to BOP officials.

In a similar FTCA case alleging injury from exposure to secondhand smoke at FCI McKean, *Ellis v. United States,* No. 05-286E, slip op. (W.D. Pa. June 29, 2006) (Baxter, M.J.) (attached as Exhibit 7), the district court adopted this Court's recommendation that the case be dismissed on the basis of the discretionary function exception.[12] The *Ellis* court began its discussion of this issue by examining the *Berkovitz-Gaubert* test, and the BOP regulations set forth at 28 C.F.R. § 551.160, *et seq. See Ellis,* slip op. at 6-9. As discussed, these regulations permit the Warden to designate -- in his or her discretion -- outdoor smoking areas as well as a limited number of indoor smoking areas, and to determine an institutionally-viable solution for housing nonsmoking inmates. *See* 28 C.F.R. § 551.163. However, the regulation is silent as to **how** its provisions are to be specifically implemented or enforced; a warden is not "bound to act in a particular way." *Gaubert*, 499 U.S. at 329; 28 C.F.R. § 551.160, *et seq.* Accordingly, *Ellis*

---

[12]*Ellis* differed only in that the plaintiff alleged exposure to ETS at both FCI McKean and at a federal prison located in Philadelphia, Pennsylvania ("FCI Philadelphia"). *See id.* at 1.

found that "[t]he regulation gives explicit discretion to the Warden to make these decisions, thereby satisfying the first prong of the *Berkovitz-Gaubert* inquiry."  *See* No. 05-286E, slip op. at 9.  The same reasoning should apply to this case, and the Court should find that the first prong of *Berkovitz-Gaubert* has been satisfied.

Turning to the second prong of the *Berkovitz-Gaubert* test, *i.e.*, that the discretionary conduct was based on considerations of public policy, the *Ellis* court noted that the stated purpose of the regulation is "to advance towards becoming a clean air environment and to protect the health and safety of staff and inmates."  *See* No. 05-286E, slip op. at 9 (quoting 28 C.F.R. § 551.160).  Given this stated purpose and "the presumption toward policy considerations leading to the creation of the regulation," the court found that the second prong of the Berkovitz-Gaubert test had been satisfied.  *See id.* at 9-10.  Again, the same reasoning should apply here.  Indeed, the very nature of the conduct regulated by the statute – the use of tobacco products by staff and inmates  – involved public policy considerations in balancing the interests of staff and inmates with long histories of legal nicotine addiction, with the interests of all staff and inmates to work and live in a habitable environment.  *See* 28 C.F.R. § 551.160, *et seq.*  During the time in question, the use of tobacco products was not a criminal act, and the regulations/smoking policies considered several interests including: (i) rights of staff employed at FCI McKean; (ii) rights of inmates incarcerated at FCI McKean; and (iii) the health concerns of all who live and work at FCI McKean.  (*See* Decl. of John LaManna, Ex. 6, ¶ 9.)[13]

---

[13]Plaintiff's insinuation that staff at FCI McKean had a non-discretionary duty to curtail the sale of all tobacco products and house all non-smoking inmates separately from smoking inmates misconstrues the smoking regulation and institution supplement.  Similarly, plaintiff's argument that staff failed to prevent tobacco smoke from traveling to non-designated smoking areas places an additional duty upon staff not set forth in policy, regulation or statute.  *See* 28

In this case, plaintiff does not allege that the Individual Defendants violated any mandatory duty.  To the contrary, he appears to allege that he was injured because prison officials **complied** with the BOP's and FCI McKean's smoking policies.  (*See, e.g.,* Second Am. Compl., ¶ 11) (alleging that defendant LaManna "caused policy to be implemented and/or carried out for ETS to be spreaded [sic], thus causing Plaintiff to be exposed and contrary to his request not to be.") There is no allegation that FCI McKean allowed smoking in non-smoking areas, or that the Individual Defendants violated any other mandatory duty.  Because plaintiff here challenges decisions that were discretionary – not mandatory – in nature, the discretionary function exception applies.

     C.     **Plaintiff Cannot Demonstrate That He Suffered An Actual Injury Caused By Secondhand Smoke**

Although the discretionary function exception applies, this Court need not even reach the issue because, as in *Ellis*, plaintiff here cannot establish an actual injury caused by ETS.  As this Court explained, "[u]nder Pennsylvania law, no cause of action arises for personal injury until there has been an actual injury." *Ellis,* No. 05-286E, slip op. at 12 (citing cases); *see also Engel v. Parkway Co.,* 439 Pa. 559, 562 (1970).  It further noted that "a tort action cannot be sustained on the basis of speculative future injuries." *Ellis,* No. 05-286E, slip op. at 12 (citing *Peterman v. Techalloy Co.*, No. No. 81-8967, 1982 WL 124 (Pa. Com. Pl. February 26, 1982)).  Because the medical record revealed that all of plaintiff's alleged ailments were purely speculative, *Ellis* dismissed plaintiff's negligence claims.  *See Ellis,* No. 05-286E, slip op. at 12.

---

C.F.R. § 551.160, *et seq.*

As noted, plaintiff's Second Amended Complaint alleges no injury.[14]  To the extent that the Court considers the allegations in his original Complaint, plaintiff complains that the levels of secondhand smoke at FCI McKean caused him to suffer a litany of illnesses including nausea, "the inability to eat," headaches, chest pains, difficulty breathing, numbness in limbs, teary eyes, itching, burning skin, dizziness, sore throat, coughing and production of sputum.  (*See* Compl., ¶ 27.)  As in *Ellis*, plaintiff's allegations appear to be entirely speculative; indeed, they have no support in plaintiff's prison medical records.

According to plaintiff's medical records, he has had few health complaints and none related to exposure to secondhand smoke.  To the contrary, plaintiff **denied** having many of the ailments listed in paragraph 27 of his Complaint.  During intake screening examinations in 1997 and again in 2004, plaintiff denied that he had or ever had any of the following conditions: dizziness or fainting spells, ear, nose or throat trouble, chronic or frequent colds, sinusitis, skin diseases, shortness of breath, pain or pressure in his chest, chronic cough, palpitation or pounding heart, indigestion or recent gain or loss of weight.  (*See* Plaintiff's Prison Medical Records, Ex. 5a, at pp. 25, 27 and 29.)  Furthermore, it was noted during a medical examination on July 16, 1997 that plaintiff had normal nose, sinuses, mouth and throat, lungs and chest, heart, abdomen and viscera.  (*See id.* at 21.)  Between July 8, 1997 and December 29, 2006, plaintiff sought medical attention only eight separate occasions.  (*See* Plaintiff's Prison Medical Records, Ex. 5a, at pp. 1-8.)  In summary, the evidence demonstrates that plaintiff has not made any medical complains or expressed any concerns related to secondhand smoke.  Because plaintiff

---

[14]The Second Amended Complaint should also be dismissed on the basis that plaintiff fails to request any damages or relief.  *See* Fed. R. Civ. P. 8(a)(3) ("A pleading which sets forth a claim for relief . . . shall contain . . . (3) a demand for judgment for the relief the pleader seeks.").

cannot show that he suffered an actual injury related to ETS exposure, his claims should be dismissed.[15]

### CONCLUSION

For all the foregoing reasons, this Court should dismiss plaintiff's Second Amended Complaint with prejudice or, in the alternative, grant summary judgment in defendants' favor.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney

s/ Megan E. Farrell
_____
MEGAN E. FARRELL
Assistant U.S. Attorney
Western District of PA
700 Grant St., Suite 4000
Pittsburgh, PA 15219
(412) 894-7429
PA ID # 76972

Dated: February 5, 2007                    Counsel for defendants

---

[15]Plaintiff also fails to establish the elements of duty or breach of duty. *See Ferry v. Fisher*, 709 A.2d 399, 402 (Pa. Super. 1998) (elements of negligence claim under Pa. law). Contrary to plaintiff's allegations, no duty can arise from the Institution Supplements at FCI McKean. The FTCA enables private individuals to sue the United States "under circumstances where the United States if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Accordingly, only torts that allege a violation recoverable under state tort law may be maintained under the FTCA. It is well-settled that violations of federal statutory or constitutional rights are not actionable under the FTCA. *See, e.g., Carlson v. Green*, 446 U.S. 15, 19 (1980). Nor is counsel aware of any similar duties imposed on individuals under Pennsylvania law. Because plaintiff has failed to establish the element of duty, he cannot establish a breach of that duty. But even assuming that he could establish the first element, there is no evidence of a breach. Although the BOP had a duty to exercise ordinary care, *see* 18 U.S.C. § 4042, there is no evidence that it breached this duty with respect to the sale of tobacco products, or the assignment of inmates to housing units. Again, there is no evidence in plaintiff's medical records that he ever complained to institution staff regarding excessive exposure to ETS.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of February, 2007, a true and correct copy of

the within Defendants' Motion to Dismiss Plaintiff's Second Amended Complain or, in the

Alternative, Motion for Summary Judgment and Brief in Support thereof was served via first-

class mail upon the following:

Demetrius Brown
#21534-039
FCI Ray Brook
P.O. Box 9001
Raybrook, NY 12977

s/ Megan E. Farrell
MEGAN E. FARRELL
Assistant U.S. Attorney