IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

DEMETRIUS BROWN,
      Plaintiff,

    v.

UNITED STATES,
U.S. JUSTICE DEPARTMENT,
BUREAU OF PRISONS (BOP)
FCI McKEAN, HARLEY G. LAPPIN-
Director of BOP, NEWTON E.
KENDIG- Medical Director of
BOP, D. SCOTT DODRILL- North-
east Regional Director of BOP,
JOHN J. LAMANNA- Warden of
FCI McKEAN,
      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**THIRD AMENDED
COMPLAINT**

Civil Action No. 04-379 Erie

RECEIVED

MAR 1 2 2007

CLERK U S DISTRICT COURT

## I. JURISDICTION

    1. This Court has original jurisdiction of Civil Rights
Actions under 28 U.S.C. §1343(a)(3-4) as authorized by 42 U.S.C.
§12131 et. seq. and 42 U.S.C. §12132 to redress the deprivation,
under color of any state law, statute, ordinance, regulation,
custom or usage, of any right, privilege or immunity secured by
the Constitution of the United States or by any Act of Congress
providing for equal rights of citizens or of all persons within
the jurisdiction of the United States.

    2. This Court has supplemental jurisdiction pursuant to
28 U.S.C. §1367(a) for "Bivens Claims" under the general juris-

diction statute 28 U.S.C. §1331.

3. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) of Federal Tort Claims under 28 U.S.C. §1346(b)(1) as authorized by 28 U.S.C. §2672 et. seq., to redress personal injury caused by the negligent or wrongful act or omission of employees of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the law of the place where the act or omission occurred.

## II. VENUE

4. This Court has venue of a Civil Rights Action pursuant to 28 U.S.C. §1391(e) in which an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may except as otherwise provided by law, be brought in any judicial district in which a defendant in the action resides.

5. This Court also has venue pursuant to 28 U.S.C. §1402(b) in a civil action on a tort claim against the United States wherein the act or omission complained of occurred.

## III. <u>PARTIES</u>

A. Plaintiff

6. Demetrius Brown (true name Darius Duane Dixson), a
resident of Detroit, MI, herein as Plaintiff, appearing propria
persona, is currently confined as an inmate in the custody of
the United States Justice Department, Bureau of Prisons, FCI
RayBrook. From July 8, 1997 to October 29, 2004, Plaintiff was
at all times confined at the Bureau of Prisons' Federal Correct-
ional Institution (FCI) McKean (a medium/high security level
institution) in Bradford, Pennsylvania. From November 4, 2004
until present, Plaintiff has at all times been confined at the
Bureau of Prisons' Federal Correctional Institution (FCI) RayBrook
(a medium/high security level institution) in RayBrook, New York.
Plaintiff has been in the custody of the Bureau of Prisons for
almost a total of 10 years and will have at least another 15
years with the anticipation of good-conduct time added to complete
service of his sentence.

B. Defendants

7. The Defendant United States is the "sovereign" authority
for the government of the United States of America. An authority
divided into three branches of government: legislative, judicial,
and executive. It functions as the central government for the
United States of America whose seat is domiciled in Washington,
D.C., yet the United States is in any and every state. The United

States by its Executive Branch title is sued in its individual and official capacities, both of which its sovereign immunity have been waived.

8. The Defendant United States Justice Department is the agency department of the United States government responsible for adhering justice throughout the United States. The Department plays the key role in protection against criminals and subversion, in ensuring healthy competition of business in our free enterprise system, in safe guarding the consumer, and in enforcing drug, immigration, and naturalization laws. The Department also plays a significant role in protecting citizens through its efforts for effective law enforcement, crime prevention, crime detection, and prosecution and rehabilitation of offenders. Its offices comprise of many other agencies of which the Bureau of Prisons is apart. The United States Justice Department is domiciled in the Robert F. Kennedy Building at 950 Pennsylvania Avenue N.W., Washington, D.C. 20530. Yet, it operates in buildings and offices throughout the whole of the United States. The United States Justice Department is sued individually as an agency and officially under the United States, both of which its sovereign immunity have been waived.

9. The Defendant Bureau of Prisons is an agency within the United States Justice Department. Its responsibilities are to protect society by confining offenders in the controlled environ-

ments of prison and community-based facilities that are safe,
humane, and appropriately secure, and that provide work and other
self-improvement opportunities to assist offenders in becoming
law-abiding citizens. The Bureau helps protect public safety and
reduce future criminal activity by encouraging inmates to partici-
pate in a range of programs that help them adopt a crime free-
lifestyle upon their return to the community. The Bureau of Prisons
is Headquartered at its Central Office which is domiciled at the
HomeOwners Loan Corporation Building, 320 First Street, N.W.,
Washington, D.C. 20534, and comprising of eight divisions that's
responsible for establishing national policy, developing and
reviewing programs, providing training and technical assistance
to the field, and coordinating agency operations in the various
disciplines. The Bureau also has divided responsiblity for over-
seeing day-to-day operations of federal prisons into six regions.
The Bureau of Prisons is sued individually as an agency and
officially under the United States, both of which its sovereign
immunity have been waived.

10. The Defendant Federal Correctional Institution (FCI)
McKean is a property division of the Bureau of Prisons. Its resp-
onsibility is for the safe and secure housing of male offenders
committed to the custody of the United States Justice Department,
Bureau of Prisons. It is domiciled in a complex on Route 59,
Big Shanty Road, P.O. Box 5000, Lewis Run, Pennsylvania 16738.

FCI McKean is sued individually as an agency and officially under the United States, both of which sovereign immunity are waived.

11. The Defendant Harley G. Lappin is the Director of the Bureau of Prisons. He is the chief controller of all prison operations in the United States of America and elsewhere. His authority is resounding to issuing orders and directing the affairs of the Bureau of Prisons through subordinates. He is the overseer for initiating, following, and removing policy. He is domiciled at the place of business which is located at the HomeOwners Loan Corporation Building, 320 First Street, N.W., Washington, D.C. 20534. He is sued in both capacities, individually as a person, and officially as the United States.

12. The Defendant Newton E. Kendig is the Medical Director of the Bureau of Prisons. He is the chief medical personnel responsible for the policies affecting all functioning of medical facilities located within the Bureau of Prisons. He is the overseer for the implementation of prison policy as it affects the health of inmates, i.e. the Bureau of Prisons move toward a non-smoking institution. He is domiciled at the place of business which is located at the HomeOwners Loan Corporation Building, 320 First Street, N.W., Washington, D.C. 20534. He is sued in both capacities, individually as a person, and officially as the United States.

13. The Defendant D. Scott Dodrill is the Regional Director to the Northeast Region of the Bureau of Prisons. His responsibility is to oversee day-to-day operations of federal prisons. He is to provide oversight to the Federal Prisons and community correction offices. He is domiciled at the place of business located at U.S. Customs House, 2nd and Chestnut Streets, 7th Floor, Philadelphia, Pennsylvania 19106. He is sued in both capacities, individually as a person and officially as the United States.

14. The Defendant John J. LaManna [formerly] the Warden at FCI McKean. His responsibility is to manage the prison and to report to a regional director. He is to provide suitable quarters and provide for safe keeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; to provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States. He is domiciled [during the time complained] at the place of business located at FCI McKean on Route 59, Big Shanty Road, P.O. Box 5000, Lewis Run, Pennsylvania 16738. He is sued in both capacities, individually as a person and officially as the United States.

## IV. EXHAUSTION OF REMEDIES

A. Administrative

15. On December 25, 2003, Plaintiff filed a Bureau of Prisons Informal Resolution Form (BP-8) complaining to FCI McKean's Counselor Ned Watson, that because Plaintiff was continually exposed

to Environmental Tobacco Smoke (ETS), that all non-smoker's including himself be separated from smoking inmates. That, Plaintiff also be compensated for his personal injuries, in the amount of $10,000,000.00 (Ten Million Dollars). See **Exhibit 1a.**

16. On December 30, 2003, FCI McKean's Ned Watson responded, denying Plaintiff's request to be separated from smoking inmates by asserting it would not be practicable. See **Exhibit 1a.**

17. On January 7, 2004, Plaintiff filed a Bureau of Prisons Administrative Remedy (BP-9) complaining to FCI McKean's Warden John J. LaManna, that because Plaintiff had been continuously exposed to ETS, that all non-smoker's including himself be separated from smoking inmates. That, Plaintiff also be compensated for his personal injuries, in the amount of $10,000,000.00 (Ten Million Dollars). See **Exhibit 1b.**

18. On January 21, 2004, FCI McKean's Warden John J. LaManna responded to Plaintiff's BP-9 by denying his request to be separated from smoking inmates by asserting Program Statement §1640.03 and that because of this, he, the Warden had designated lower tiers of the housing units to be a non-smoking area. See **Exhibit 1b.**

19. On January 29, 2004, Plaintiff filed a Bureau of Prisons Administrative Remedy (BP-10) appealing the Warden's Response denying his BP-9 request. See **Exhibit 1c.**

20. On March 2, 2004, the Northeast Regional Director D. Scott Dodrill responded denying Plaintiff's appeal of the Warden's BP-9 Response. The Regional Director in denying Plaintiff's appeal cited

Program Statement §1640.03, smoking/no smoking areas; that the Warden designated lower tiers of which have been designated as non-smoking areas. That, FCI McKean has been diligent to enforce the smoking policy. See **Exhibit 1c.**

21. On March 28, 2004, Plaintiff filed a Bureau of Prisons Administrative Remedy (BP-11) appealing the Regional Director's Response denying his BP-10 appeal. See **Exhibit 1d.**

22. On May 28, 2004, the Administrator for the National Inmate Appeals, Harrell Watts, responded denying Plaintiff's appeal of the Regional Director's BP-10 Response. The Administrator in denying Plaintiff's appeal noted that both the Warden and the Regional Director had adequately addressed Plaintiff's concerns. That, also because the Bureau of Prisons had recently reissued its Program Statement §1640.04 entitled smoking/no smoking areas, the revised policy would severely limit areas where smoking is permitted. And, that staff would be working diligently to implement and enforce the policy. See **Exhibit 1d**

B. Tort

23. On January 20, 2004, Plaintiff filed an Administrative Tort Claim pursuant to 28 U.S.C. §2672 et. seq. to the Northeast Regional Director's Office making complaint that he had been exposed continuously to ETS and that as a result, he suffered various personal injuries. See **Exhibit 1e.**

24. On June 24, 2004, the Regional Counsel, Henry J. Sadowski responded to Plaintiff's Administrative Tort Claim for compensatory damages in the amount of $10,000,000.00 (Ten Million Dollars) for personal injuries suffered as a result of second-hand smoke. In responding, the Regional Counsel decided not to offer settlement, and thus denied claim altogether. The Regional Counsel's denial relied primarily on Program Statement §1640.03 as prescribed by 28 CFR §551.160 et. seq. The Regional Counsel also noted that there was no evidence to suggest that I have experienced a personal injury as the result of negligence on the part of any Bureau of Prisons' employee. See **Exhibit 1e.**

## V. PROCEDURAL BACKGROUND

25. On December 28, 2004, Plaintiff filed complaint into the United States Dsitrict Court for the Western District of Pennsylvania under the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346(b), 2671 et. seq. alleging personal injuries caused by his exposure to second-hand smoke or Environmental Tobacco Smoke ("ETS") during his incarceration, seeking $10,000,000.00 (Ten Million Dollars) in damages.

26. On January 3, 2006, Defendants filed an answer to Plaintiff's complaint by requesting a Motion to Substitute with brief in support; A Motion to Strike Demand for Trial by Jury with brief in support ; and a Motion to Dismiss or in the alternative Motion for Summary Dismissal with brief in support.

27. On February 17, 2006, Plaintiff filed response to Defendants Motion to Dismiss; Motion to Strike Demand for Trial by Jury; and Motion to Substitute Party. Plaintiff in turn filed a Second Amended Complaint along with Motions for Physical Examination, Preliminary Injunction, and Joinder with Exhibits.

28. On March 8, 2006, Magistrate Judge ordered Defendants to Respond to Plaintiff's Motion for Joinder and Second Amended Complaint.

29. On March 22, 2006, Defendants Responded to Plaintiff's Motion for Joinder and Second Amended Complaint with a Motion to Extend Time for filing a responsive pleading and/or dispositive motion.

30. On March 23, 2006, Magistrate Judge denied Defendants Motion to Substitute Party, Motion to Strike Demand for Trial by Jury, Motion to Dismiss, or in the Alternative Summary Judgment; Denying Plaintiff's Motion for Physical Examination yet, granting his Motion for Joinder and Motion for Second Amended Complaint. Defendants however, granted extension of time to file response, reply to Motion to Amend.

31. On March 30, 2006, Plaintiff filed a Notice of Appeal to the Third Circuit Court of Appeals, appealing Motion for Preliminary Injunction.

32. On November 16, 2006, the Third Circuit dismissed appeal for lack of appellate jurisdiction and remanded the case to the

District Court.

33. On January 16, 2007, Magistrate Judge ordered Defendants
to Respond to Plaintiff's Second Amended Complaint.

34. On Febraury 5, 2007, Defendants responded to Plaintiff's
Second Amended Complaint requesting Motion to Dismiss, or in the
Alternative Motion for Summary Judgment. Magistrate Judge, in turn,
ordered Plaintiff to respond with the discretion to Amend Complaint
by 2/26/07.

## VI. **FACTS**

35. On July 26, 1990, Congress enacted the Americans with
Disability Act. Under this Act Congress set out to enforce prov-
sions in compliance with section 5 of the Constitution's Fourteenth
Amendment. This particular act set rise for a cause of action for
discrimination based upon disability. The disability under the
act is defined as one being without one or more life's major
functions. If this be the case, then it is illegal for a state
entity to discriminate on the basis of that when it comes to offerr-
ing up service, programs, or activities. See **Exhibit 2a.**

36. On May 2, 1991, the legislature in the District of Columbia
enacted laws restricting smoking within its District to anyone.
The law forbids smoking in all public places such as any elevators
(with an exception); any public selling areas (with an exception);
any public assembly or hearing rooms; any educational facility;
transportation vehicles (with stipulations); any area of a health

care facility frequented by the general public (with stipulations); any restaurant (with stipulation); and any public or private workplace (with exceptions). The District of Columbia also made an enforcement provision and penalty provision along with such restrictions. See **Exhibit 2b.**

37. On July 26, 1991, the United States Justice Department implemented regulations for enforcing the Americans with Disability Act enacted by Congress. See **Exhibit 2c.**

38. On January 7, 1993, the Environmental Protection Agency (EPA) officially endorsed a report by an outside panel of scientific advisors to the agency, which stated "exposure to second-hand cigarette smoke causes lung cancer in adults and greatly increases the risk of respiratory illness in children."

39. On July 6, 1994, the U.S. Justice Department promulgated under the Code of Federal Regulations, Title 28 CFR §551.160 et. seq., regulating smoking within the institutions and offices of the Bureau of Prisons. See **Exhibit 2d.**

40. On August 1, 1994, the Bureau of Prisons, made effective, consistent with the implications raised by the report endorsed in 1993 by the EPA on second-hand smoke and the advisories given by health authorities, by establishing a long-range goal of creating a smoke-free workplace and clean air environment. The Bureau of Prisons along with this goal issued Program Statement §1640.03. See **Exhibit 2e.**

41. The purpose and scope of Program Statement §1640.03, adopted from the Code of Federal Regulations, 28 CFR §551.160, is to advance towards becoming a clean air environment and to protect the health and safety of staff and inmates, the Bureau of Prisons will restrict areas and circumstances where smoking is permitted within its institutions and offices.

42. BOP Program Statement §1640.03 mandates that, in correctional institutions smoking prohibitions (no smoking areas) **shall** apply equally to staff and inmates.

43. BOP Program Statement §1640.03 acknowledged by stating the hazards of tobacco smoke are now well established by **medical** and **public health authorities**. The risk posed to non-smokers by passive inhalation of environmental tobacco smoke (ETS) are of particular concern.

44. In defining smoking, Justice Department regulation 28 CFR §551.161 as implemented by BOP Program Statement §1640.03 at ¶4 states, smoking is defined as carrying or inhaling a lighted cigar, cigarette, pipe, or other lighted tobacco products.

45. Justice Department regulation 28 CFR §551.162 as implemented by BOP Program Statement §1640.03 at ¶5 states, all areas of Bureau of Prisons facilities and vehicles are no smoking areas unless specifically designated as a smoking area by the Warden as set forth in §551.163.

46. Justice Department regulation 28 CFR §551.163 as implemented by BOP Program Statement §1640.03 at ¶6(b) states, at all low medium, high, and administrative institutions other than medical referral centers, the Warden shall identify outdoor smoking areas and may, but is not required to, designate a limited number of indoor smoking areas where the needs of effective operations so require, especially for those who may be employed in or restricted to, a non-smoking area for an extended period of time. At ¶6(c) it states, to the maximum extent practicable non-smoking inmates shall be housed in non-smoking living quarters.

47. Justice Department regulation 28 CFR §551.164 as implemented by BOP Program §1640.03 at ¶7 states, the Warden shall ensure that smoking sareas are clearly identified by the appropriate placement of signs. The absence of a sign shall be interpreted as indicating a no-smoking area. Appropriate disciplinary action shall be taken for failure to observe smoking restrictions.

48. BOP Program Statement §1640.03 at ¶9 states that each institution shall develop an institution supplement containing information on its smoking restrictions and identifying smoking areas within the institution. At ¶10, it states, existing labor management agreements regarding the implementation of a smoke-free environment shall be honored except to the extent that such agreements would permit indoor smoking in derogation of this Program Statement for more than one year beyond the effective date of this directive.

49. BOP Program Statement §1640.03 at ¶11 states, the
provisions of this Program Statement become effective August 1,
1994. Where special implementation problems exist, the **Medical
Director,** upon written request from a **Warden** through the appro-
priate **Regional Director,** may allow an extension of up to **six months**
for compliance.

50. On August 9, 1997, The President of the United States or
Chief Executive Officer of the United States Government, in charge
of all departments and agencies of the Executive Branch, issued
Executive Order 13058 as the policy of the Executive Branch. The
purpose, to establish a smoke-free environment for Federal Employees
and members of the public visiting or using Federal facilities.
The Order, promulgated into law by the Code of Federal Regulations
at 41 CFR §101-20.105-3(a). (See **Exhibit 2f**).And, due to the Execu-
tive Order having general applicability- legal effect not only
against Federal agencies or persons in their capacity as officers,
agents, or employees, but the public at large - it was also publish-
ed in the Federal Register.

51. On December 8, 1997, FCI McKean implemented Institution
Supplement §1640.03, thereby rescinding Institution Supplement
§1640.2 smoking/no smoking areas, dated December 27, 1995.
See **Exhibit 2g.**

52. FCI McKean's Institution Supplement §1640.03 states,
¶1, the purpose: To establish smoking and non-smoking areas for

staff and inmates at the Federal Correctional Institution, (FCI),
Federal Prison Camp, (FPC), McKean.

53. FCI McKean's Institution Supplement §1640.03 states,
the Procedure: (a) Staff: FCI, McKean and FPC, McKean have been
designated as non-smoking institutions. Staff are prohibited from
smoking inside of buildings or entrance-ways of camp facility or
main institution; (b) Inmates: (2) Main Institution: (a) Housing
Units: Smoking is only permitted in inmate rooms as designated by
the Unit Manager of each Unit. In the event that the inmate room
is assigned to one inmate smoker and one non-smoker, the room will
be designated a non-smoking room. There is no smoking in the common
areas, other multipurpose areas, or entrance ways of the housing
units.

54. On May 15, 1997, the U.S. District Court for the District
of Minnesota committed Plaintiff to the custody of the U.S. Attorney
General, i.e. U.S. Justice Department, for a term of 360 months
for drug crime violations. For service of the sentence, Plaintiff
was designated to the custody of the Bureau of Prisons and trans-
ferred to FCI McKean where he was housed.

55. On July 7, 1997, Plaintiff arrived at FCI McKean. During
intake screening, Plaintiff was given a form to fill out evaluating
his medical condition and needs. Plaintiff is not a qualified
medical doctor nor have had any medical training. Plaintiff filled
out intake forms only according to his limited knowledge of what

many questions presented. No doctor did any personal examination
on Plaintiff to determine otherwise but, Plaintiff accepted the
form as is from an unqualified person of medical background for
accessing medical conditions.

56. Plaintiff's personal knowledge of what was presented on
the medical intake form was that of his name; his residence being
Detroit, MI.; that he was hospitalized once due to a hand fracture;
that he had once contracted an STD prior to being imprisoned; that
he tried marijuana before but, that he was a non-smoker; and that
he did not eat pork. The rest of the information presented on
the intake form was from a non-factual assumption.

57. After the intake process was done, Plaintiff was immediately
assigned to housing Unit 3, side B. He was assigned therein to the
upper level tier in a cell occupying 6 inmates, including Plaintiff.
While in the cell, Plaintiff recalls that there were several inmates
who were smokers, either of cigarettes or other tobacco products.
Plaintiff was forced to leave the 6-man cell for escape when air
became unbearable to breathe. However, during lock downs, Plaintiff
was forced to stay in the cell breathing the smoke filled air.

58. Plaintiff was made to endure a smoke filled 6-man cell
caused by the several inmates who were assigned to that room, as
well as having to endure the smoke blown by the associates of those
inmates who celled with Plaintiff as they would come by and smoke
in groups. After 2-3 months of housing in a smoke filled cell with
several other inmates, Plaintiff was moved to cell 209.(See
**Exhibit 3a**). This was apparently still an upper level tier cell,

except that only 2 inmates would occupy the cell. Unfortunately however, Plaintiff's cell mate smoked cigarettes as well. Plaintiff was housed with an inmate who smoked at least, by himself, 3 packs of cigarettes a day.

59. Plaintiff did not realize at that time that cigarettes or tobacco products via second hand smoke is a cause of cancer or other ailaments like, skin disease, irritations of the eye, production of sputum, hair loss, weight loss, etc. Plaintiff was exposed continuously to second-hand smoke while housed on the upper level tier as well as when not on the upper level tier. There was smoking going on all over the Unit. Cigarettes or Tobacco smoke fumed while in the common area, where the pool table, exercise equipment, and T.V.'s were. Cigarettes or tobacco smoke fumed near the entrance ways to the units and virtually every place on the prison compound and yard. See **Exhibit 3b.**

60. There was no controlled movement in 1997, so inmates could come and go when they choose. Correctional Officers were very lax and did not bother to enforce any, if too many, rules. In fact, there was no policy enforced on smoking. Plaintiff knows of no incident incurring a smoking policies because it was evident smoking cigarettes or tobacco products were, as one saw fit.

61. Plaintiff witnessed even correctional officers smoking cigarettes or tobacco products. Correctional officers would smoke cigarettes or tobacco products while sitting in their office, while standing in front of the entrance way to the unit and in front of

the air ducts to the units. I witnessed correctional officers walk up and down the compound and in front of every building smoking cigarettes or tobacco products. See **Exhibit 3c.**

62. In the spring of 1998, Plaintiff was asked by Austin Nwanze to sign on to a class action lawsuit concerning the Tobacco Companies negligence to selling tobacco products in prisons and the future effects of such. (See **Exhibit 3d**). Plaintiff did not have any understanding of the law or of any cause of action other than he trusted Mr. Nwanze to protect his rights, if there were any. After such, Plaintiff rarely discussed or heard of any progress or status concerning the case. The only memorable moment was when Prison Officials made it a big issue for anyone who was a non-smoker to sign a record stating so, and that they would be moved to a lower tier cell.

63. Plaintiff had already stated he was a non-smoker during his initial intake screening in July of 1997. But, despite that, Plaintiff signed the record sheet and, in May of 1998, he moved to cell 126 on the lower tier. It was no different, however. The lower tier cell was probably worse because smokers would stand outside the cell and smoke or pass by smoking. Plaintiff would still come to be exposed to second-hand smoke. And, although the lower tier was technically a supposed area for non-smokers, smokers ignored that fact. Even inmates housed on the lower tier, were sometimes smokers hiding the fact that they smoked cigarettes or tobacco products. See **Exhibit 3e.**

64. Plaintiff remained on the first level tier for the
remainder of his time at FCI McKean with the exception of going
to the Segregation Housing Unit (SHU) and returning to Unit CB,
making only few, but periodic cell changes because of the strong
stench of cigarettes or tobacco smoke that invaded the cells with-
out difference. Nevertheless, Plaintiff went on with living his
life to the best he could.

65. Plaintiff began to get involved with educating himself
heavily into all forms of thought. From religion, business, law,
hydroponics, parenting, drug education, accounting, etc. Plaintiff
took an interest in hydroponics in June of 1998. It presented
Plaintiff the essentials of life and how to sustain it. The require-
ments of growing plant life with the material needs such as sunlight,
soil, water, and air; along with nutrients in each, helped to sust-
ain life similar to humans. Plaintiff learned to measure in the
smallest of measurements, parts per million (ppm) for determining
the units of producing a healthy plant life. (See **Exhibit 4a**). This
was of a course that made Plaintiff think of the value life presents
and how precious it is and the need to sustain it for its purpose.

66. It still did not occur to Plaintiff that at this time,
there was a cause for him to be alarmed about concerning his own
life. Plaintiff for once felt that the environment was safe and
condusive to growth. That, there was nothing that needed to be
addressed immediately. The fact that Plaintiff was young, fertile,
and full of health, did not bring the occurrence to mind of death.

Death imagined in a prison setting had been one where an adversary was wielding a home made knife. Besides, if there was something to be alarmed concerning Plaintiff's health, he knew that there was more likely nothing would be or could be done about it. Plaintiff had witnessed inmates die literally at the hands of Prison Officials after having sought medical attention and were misdiagnosed or because of malpractice became dead-on-arrival (doa).

67. As the years went on, Plaintiff witnessed the addiction of inmates as well as staff to cigarettes or tobacco products. The need for nicotine became unbearable for them. Cigarettes or tobacco products were forms of money for some inmates, while a drug for others. Debts were incurred from cigarettes or tobacco products and thereby assaults escalated. Cigarette or tobacco products became a scourge to not only Plaintiff but, to all non-smokers. Having this feeling, Plaintiff although not required, participated voluntarily in a 40 hour drug program on or about in July of 2003 so as to determine why drugs both illegal and legal like nicotine in cigarettes caused people to behave the way that they do. (See **Exhibit 4b**). The impressing thing Plaintiff discovered is not only is nicotine addictive in that it causes uncontrollable cravings but, that cigar-ettes or tobacco products were deadly in that they possessed other ingredients, some 4000 of which could kill, even by second-hand smoke. Plaintiff never knew this because taking note of the package, it would read that smoking could cause cancer... but however, not disclosing that it was by way of second-hand smoke. See **Exhibit 4c.**

68. As a result of finding these facts out, Plaintiff began a diligent search as to what might be done to change his environment in order to fit one that was more condusive to life and not death. Plaintiff would walk the compound with a friend and would discuss how difficult it was to even walk the sidewalk behind inmates and sometimes staff who would smoke directly ahead; how difficult it was to escape the smoke, having to cover one's nose and mouth as to not feel the effects of second-hand smoke which became a desperation for intolerance. See **Exhibit 4d.**

69. It was in December of 2003, that Plaintiff initially began to exhaust his Administrative Remedies that, he filed an informal remedy to his Counselor, Ned Watson complaining about cigarette smoke and being subject to exposer by second-hand. That because of this, Plaintiff wanted separation from smokers. Plaintiff in addition, sought to be compensated in terms of dollars for his pain and suffering. Counselor Ned Watson rejected Plaintiff's complaint and therefore failed to informally resolve the issue. Plaintiff complained next to Warden John J. LaManna by filing a formal Administrative Remedy and basically asserting the same issue. Warden John J. LaManna rejected Plaintiff's complaint. Plaintiff then filed his appeal to the Northeast Regional Director, D. Scott Dodrill asserting this same issue. D. Scott Dodrill denied the issue. Plaintiff lastly, appealed to the Central Office of the Bureau of Prisons, again asserting the same issue. And finally, there the issue was denied

as well.

70. Also, Plaintiff sought remedy for the personal injuries
he incurred from being exposed to second-hand smoke or Environmental
Tobacco Smoke (ETS) by filing a Federal Tort Claims with the North-
east Regional Office. The fact that Plaintiff was experiencing the
effects of ETS such as coughing, itchy eyes, production of sputum,
chest pains, skin irritations, nose irritation, racing heart, head-
aches, dizziness, etc., he understood that FCI McKean was responsi-
blefor subjecting him to the horrendous conditions which caused
these injuries. Plaintiff, was not positively aware of whether he
contracted the disease of cancer, at that time, because he had not
undergone any tests to indicate it but, Plaintiff knew the possibili-
ties were not considering the conditions he had experienced by being
exposed to ETS. And so, therefore, Plaintiff understood that not
only would he have the disability of being imprisoned but, that
because he is a nonsmoker, he would have the disability of ETS
exposure and later the disease called cancer. Also, Plaintiff had
not known to an extent until recently that his disability of having
contracted an STD was being excacerbated because of his exposure
to second-hand smoke. In all, Plaintiff did not receive any relief
for which he claimed due to being bunched together with cigarette
or tobacco product smokers. The Regional Director's Office denied
Plaintiff's Administrative Remedy under the FTCA due to having not
presented sufficient evidence of his personal injuries.

71. Plaintiff continued to be exposed to cigarette or tobacco product smoke from both inmates and staff or correctional officers well into 2004. Although Plaintiff was housed on the first level of Unit CB, he would still have the discomfort of having to smell cigarette or tobacco smoke. There was no place in the Unit to escape it. The more Plaintiff was exposed to cigarette or tobacco smoke, the more exasperating his injuries became. By this time, Plaintiff had been exposed to cigarette or tobacco product smoke for seven years since 1997 when he entered FCI McKean virtually a perfect healthy black male. Now, Plaintiff was experiencing incalculable bodily changes consistent with ETS exposure. Plaintiff eyes began to become blurred. Plaintiff entered Prison with a 20/20 vision. He now has a 20/15 vision. Plaintiff's hair follicles have been falling out. Before Plaintiff entered Prison, his hair follicles had never fqllen  out. Plaintiff has began to develope strange red markings over his torso, neck, and face. Before Plaintiff entered prison, he had no strange looking red markings. Plaintiff also had developed a swelling behind his right ear that he believes is a cancerous tumor. Before he entered prison, there was no swelling. Plaintiff has a red mark near the pupil of his right eye. Before he entered prison, there was no marking. Plaintiff weighed 174 lbs when entering prison. Now, he has considerably dropped weight, somewhere near 165 lbs. Plaintiff realizes that exposure to ETS has caused a host of problems for him over the years that he has

been in proximity to smokers. See **Exhibit 5.**

72. So, Plaintiff began to seek out policy, statutory, or
constitutional law that could help in finding a way for changing
the horrible conditions he was forced to be subject to. At that
time, between September and November of 2003, Plaintiff discovered
both Program Statement §1640.03 and Institution Supplement §1640.03
in the inmate law library that called for the staff and inmates to
be treated equally in regards to smoking yet, allowed inmates to
smoke inside the institution while forbidding staff the same. However,
Plaintiff knew that was not the case, since staff smoked inside the
institution anyway and contrary to policy. But importantly, Plaintiff
understood that the prime motive for equality was not there, in
policy, despite the failure to enforce it. With that, Plaintiff
sought out instead, as a blanket rule, that he as well as other non-
smokers be separated from those who smoked, just the same as staff
who were ironically protected under policy.

73. In October of 2004, after exhausting all of Plaintiff's
remedies in a separate matter alleged against the Bureau of Prisons
and staff, etc., Plaintiff filed suit in the United States Court
of Appeals for the District of Columbia Circuit. Preparing also to
file suit on the matter concerning exposure to environmental tobacco
smoke (ETS), Plaintiff was suddenly requested to pack his belongings
for transfer. Plaintiff did not request transfer, nor did he consent.
However, considering the timing of his suit against the Bureau of

Prisons and staff, it is only logical that transfer was being instituted for those very reasons. And, at the time of transfer Plaintiff was scored a low level security inmate. If transfer was necessary, then it was necessary to move Plaintiff to a low-level security institution. However, Plaintiff was transferred to another medium/high security institution not unlike FCI McKean, except that the new institution (FCI RayBrook) would be a much more farther distance from Plaintiff's family residing in Detroit, MI. The transfer in all likelihood represents retaliation due to the timing and circumstances; the distance; and the fact that policy considerations forbids lateral transfers or from medium security to medium security institutions. See **Exhibit 6**

74. On November 4, 2004, Plaintiff arrived as a newly admitted inmate to FCI RayBrook. Plaintiff had been distraught and mentally compromised due to his being transferred from FCI McKean to FCI RayBrook. Plaintiff understood only that he was being retaliated against for either exhausting his administrative remedies in contemplation to filing suit into court for tobacco smoke related injuries or because he had filed suit into the D.C. Circuit Court against the Bureau of Prisons and staff for various other reasons. Plaintiff upon arriving at FCI RayBrook, was therefore under duress and had been rebellious to any form of communication. Plaintiff did not care to talk with staff or care to fill forms out because he understood he was being retaliated against. So therefore, Plaintiff

assumed to reject anything by stating such with an emphatic no.
Plaintiff had a no care attitude due to the fact he was being
forces against his will to something that was wrong. Plaintiff
even wrote D. Scott Dodrill during the transfer process while held
over in Lewisburg hold-over facility, commanding that he stop the
transfer and to reverse the process because it was retaliatory.
Plaintiff's family (brother) called the Regional Office as well,
to voice opposition to the transfer. But, instead received the
message that "your brother knows what he did and why he's being
transferred."

75. Plaintiff, as a result, continued his pursuit in seeking
to hold Prison Officials and all responsible for the acts committed
against him. Plaintiff, therefore, filed suit into the U.S. District
Court for the District of Pennsylvania seeking relief on claims for
the tobacco related injuries. In addition, Plaintiff continued
maintenance of his prior suit in the D.C. Circuit Court until it
being later dismissed. But, however, during this period Plaintiff
observed that also FCI RayBrook's Prison Officials began a retalia-
tory program against him (at the bidding of the BOP's Central Office
or the U.S. Justice Department) by surreptitiously denying him
access to the courts. Plaintiff's mail began to become delayed by
considerable time, having the effect of denying any meaning response
that might have been had but, upon the shortened time of receiving
mail/legal mail. Also, the opening of legal mail outside Plaintiff's

presence, leaving the possibilities of copying and/or having infor-
mation stored as to the status or place of matters which may have
been confidential in terms of strategy or position of Plaintiff.
See **Exhibit 6.**

76. After filing legal claims into the U.S. District Court for
the Western District of Pennsylvania as to the tobacco smoke related
injuries suffered by Plaintiff, FCI RayBrook continued a retaliatory
program, logically instituted by the U.S. Justice Department and
the Bureau of Prisons Central Office. Plaintiff's legal mail, as
stated, had been delayed and opened without his presence. Plaintiff
had been denied the right to participate in the approved indigency
program offered by the court where, in this instance, FCI RayBrook's
fund manager failed to withdraw the needed funds initially and on
a monthly basis for maintaining forma pauperis. The funds were never
withdrawn despite a mandated order by the Magistrate Judge that it
be so done. Plaintiff, instead, was forced to borrow funds from
outside sources, with interest added, in order to institute suit
into court. See **Exhibit 6.**

77. Plaintiff also began to later notice a host of other
problems that are deemed retaliatory in that FCI RayBrook's Law
Library, representing Plaintiff's access to the courts, had been
materially made inadequate with books (published and unpublished
case cites), paper, staples, functional copier machines, functional
typewritters, or the lack thereof; reduced law library hours, etc.

That, Plaintiff had been repeatedly denied his request consenting to be transferred to his proper security level. This request being made in an attempt to correct the wrong committed by Bureau of Prison Officials in retaliation of him filing suit. Plaintiff in other areas of religious programming, for instance, had been retaliated with discrimination where his request had been to be equally provided funds as other groups of worship had been, and to be provided, withou bias, materials requested for programming. Plaintiff, in this regard, has been consistently denied and retaliated due to his position of being a non-smoker who is now exercising his right to grievance and access to the court. See **Exhibit 6.**

78. Plaintiff had been retaliated against, too, where the fact that he was transferred from FCI McKean and there where smoking had ceased indoors, that he later arrived at FCI RayBrook having to again deal with smoking indoors. Plaintiff was housed in Unit Ausable where placed in a 6-man cell, where at least three of the inmates were heavy smokers. Plaintiff was forced to endure approximately 8 months of inmates' continuous smoking in the cell before being placed in a 2-man cell. However, smoking still existed inside the Unit. No unit manager office existed in Unit Ausable. And, there was not staff to enforce any restriction on smoking. Only until after January 2006 did smoking stop but, not completely due to the illicit trade and smuggling of cigarettes or tobacco products. But, for the most part smoking did stip which only was due to the

outright ban of selling cigarettes or tobacco products.

79. Plaintiff has, in addition, been retaliated by the Bureau of Prisons through its employees and/or agents, i.e., Case Manager Dave Salamy, who has consistently denied Plaintiff transfer to his proper low-level security at an institution closer to his home and family. The Bureau of Prisons through Dave Salamy has forced Plaintiff to endure almost 3 years of grueling pain and suffering; not being able to see or visit with family because of the long distance; and to also be in constant threat or harm to his safety because of the high security status of the prison. Plaintiff has made repeated requests to the Bureau of Prisons, its employees and/or agents concerning the fact that policy dictates warrant him to be placed in a low-level security institution. That, discrimination and retaliation should not play a part in his safety concerns due to filing administrative grievances and for accessing the courts for obtaining judicial relief.

80. On June 27, 2006, the United States Surgeon General issued a report on second-hand smoke and stating for the first time that any level of exposure to cigarette or tobacco smoke may cause cancer. See **Exhibit 7.**

## VI. LEGAL CLAIMS

Conflict of Limitation Laws

81. The statute of limitations law to be applied herein is the
District of Columbia. There are exceptional circumstances of the
case that make Pennsylvania's Limitation Law or a nonclaim statute
unreasonable. Under the District of Columbia Law, the limitations
period is longer by at least 1 year and that there is an exception
for tolling due to the disability of imprisonment.

Also, the District of Columbia has the most significant
relationship to the occurrence and parties with respect to the
issue of limitations. In this regard, the occurrence of the claim
has its roots in Washington, D.C. This is the Headquarters concern-
ing all business activities of the party defendants- United States,
the United States Justice Department, Bureau of Prisons, FCI McKean,
Harley G. Lappin as Director of the Bureau of Prisons, Newton E.
Kendig as Medical Director of the Bureau of Prisons, D. Scott
Dodrill as Northeast Regional Director of the Bureau of Prison,
and John T. LaManna as Warden of FCI McKean; all defendants in their
offical capacities.

A. Title II of the Americans with Disability Act.

82. The United States Justice Department, a public entity, in its individual and offical capacity, is sued for discriminating against Plaintiff on the basis of his disability: that, (1) he is an imprisoned inmate, (2) he is a nonsmoking inmate exposed to ETS (Environmental Tobacco Smoke), and (3) exposure to ETS has exasperated his previous contracted STD (sexually transmitted disease).

83. Consistent with Title II of the Americans with Disability Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et. seq., D.C. Law 8-262 "Smoking Regulation Amendment Act of 1990," and Executive Order 13058, the United States Justice Department has failed to enforce with regulations, policy for helping to protect the health and safety of both staff and inmates equally in the Bureau of Prisons. The United States Justice Department, in this regard, is responsible for the policy failures of the Director of the Bureau of Prisons implementing Program Statement §1640.03, as well as the failures of FCI McKean's Warden John J. LaManna implementing Institution Supplement §1640.03 where having its name endorsed upon those policies.

84. The result of the United States Justice Department's failures is the discrimination of Plaintiff to the equality of protection under a program instituted toward a clean air environment. Plaintiff had been denied full opportunity as on an equal basis with staff to an environment forbidding all forms of smoking by

anyone in all federal buildings. That contrarily, regulations,
program statement, and institution supplement did not provide the
non-smoking program to inmates as it was available to staff. Therefore,
the United States Justice Department endorsing a program that dis-
criminates against Plaintiff and not enforcing the fact imprisoned;
non-smoking inmates; who may have an STD; exposed to second-hand
smoke in federal buildings are entitled to equal protection under
Title II of the ADA and Fourteenth Amendment's Due Process and
Equal Protection Clauses, the same as staff who are non-smoking,
etc., is indicative of the U.S. Justice Department's culpability.

85. The Bureau of Prisons, a public entity, in its individual
and official capacity, is sued for discriminating against Plaintiff
on the basis of his disability: that, (1) he is an imprisoned
inmate, (2) he is a nonsmoking inmate exposed to ETS (Environment-
al Tobacco Smoke), and (3) exposure to ETS has exasperated his
previous contracted STD (sexually transmitted disease).

86. Consistent with Title II of the Americans with Disability
Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et. seq.,
D.C. Law 8-262 "Smoking Regulation Amendment Act of 1990" §7-1710,
Code of Federal Regulations- 28 CFR §551.160 et.seq., and Executive
Order 13058, the Bureau of Prisons has failed to enforce with
regulations, policy for helping to protect the health and safety
of both staff and inmates, equally in its facilities or institutions.

The Bureau of Prisons is responsible for the policy failures of its Director implementing Program Statement §1640.03 as well as the failures of FCI McKean's Warden implementing Institution Supplement §1640.03 where having its name endorsed upon those policies.

87. The result of the Bureau of Prisons failures is the discrimination of Plaintiff to the equality of protection under a program instituted toward a clean-air environment. Plaintiff had been denied full opportunity as on an equal basis with staff to an environment unexposed to ETS according to Executive Order 13058 forbidding all forms of smoking by anyone in all Federal Buildings. That contrarily, regulations, program statement, and institution supplement did not provide the non-smoking program to inmates as it was available to staff. Therefore, the Bureau of Prisons endorsing a program that discriminates against Plaintiff and not enforcing the fact that imprisoned; non-smoking inmates; who may have an STD; exposed to second-hand smoke in federal buildings are entitled to equal protection under Title II of the ADA and Fourteenth Amendment's Due Process and Equal Protection Clauses, the same as staff who are non-smoking, etc., is indicative of the Bureau of Prisons culpability.

88. The Federal Correctional Institution (FCI) McKean, a public entity, in its individual and official capacity, is sued for discriminating against Plaintiff on the basis of his disability: that (1) he is an imprisoned inmate, (2) he is a non-smoking inmate exposed

to ETS (Environmental Tobacco Smoke), and (3) exposure to ETS has
exasperated his previous contracted STD (sexually transmitted disease).

89. Consistent with Title II of the Americans with Disability
Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et.seq.,
D.C. Law 8-262 "Smoking Regulation Amendment Act of 1990" §7-1710,
Code of Federal Regulations 28 CFR §551.160 et.seq., and Executive
order 13058, FCI McKean has excluded Plaintiff from participation
and thereof denied him benefits of the non-smoking program instit-
uted in Bureau of Prisons facilities. The program, designed to help
protect the health and safety of both staff and inmates equally by
restricting areas and circumstances where smoking is permitted within
Bureau of Prisons institutions. FCI McKean, in this regard, is
responsible for the policy failures of its Warden implementing
Institution Supplement §1640.03, where having its name endorsed upon
that policy.

90. The result of excluding Plaintiff from the non-smoking
program and thereof denying him its benefits is discrimination to
the equality of protection under a program instituted toward clean-
air environments. Plaintiff has been denied full opportunity as on
an equal basis with staff to an environment unexposed to ETS accord-
ing to Executive Order 13058 forbidding all forms of smoking by
anyone in all federal buildings. That contrarily, Institution Supple-
ment did not provide the non-smoking program to inmates as it was
available to staff. Therefore, FCI McKean endorsing a policy that

discriminates against Plaintiff and not enforcing the fact that
imprisoned non-smoking inmates exposed to second-hand smoke in
federal buildings are entitled to equal protection under Title II
of the ADA and Fourteenth Amendment's Due Process and Equal Prot-
ection Clauses, the same as staff who are non-smoking, etc., is
indicative of FCI McKean's culpability.

91. The Director of the Bureau of Prisons, Harley G. Lappin,
in his official capacity, a public entity, is sued for discriminating
against Plaintiff on the basis of his disability: that, (1) he is
an imprisoned inmate, (2) he is a non-smoking inmate exposed to ETS
(Environmental Tobacco Smoke), and (3) exposure to ETS has exasper-
ated his previous contracted STD (sexually transmitted disease).

92. Consistent with Title II of the Americans with Disability
Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et.seq.,
D.C. Law 8-262 "Smoking Regulation Amendment Act of 1990" §7-1710,
and Executive Order 13058, the Director of the Bureau of Prisons
has excluded Plaintiff from participation and thereof denied him
benefits of the non-smoking program instituted in Bureau of Prisons
facilities. The program is designed to help inmates protect the
health and safety of both staff and inmates equally by restricting
areas and circumstances where smoking is permitted within Bureau
of Prisons Institutions. The Director of the Bureau of Prisons in
this regard is responsible for failing to heed Executive Order 13058
forbidding all smoking in all federal Buildings by anyone. The

Director of the Bureau of Prisons with signing Program Statement §1640.03 implemented a policy alowing smoking in the Bureau of Prisons. Therefore, discriminating against non-smokers from obtaining the program objective for a clean-air environment.

93. Plaintiff has been denied full opportunity to clean-air as on an equal basis and according to Executive Order 13058. That, contrarily, Program Statement §1640.03 grants smoking to smokers thereby, excluding Plaintiff, a non-smoker, from the benefits of clean air. Therefore, Harley G. Lappin, Director of the Bureau of Prisons, endorsing with his signature, a Program Statement that discriminates against Plaintiff in that he is excluded from clean air and entitled to Due Process under Title II of the ADA and Fourteenth Amendment's Due Process and Equal Protection Clauses, the same as those who are smokers, etc., is indicative of the Director's culpability.

94. The Medical Director of the Bureau of Prisons, Newton E. Kendig, in his official capacity, a public entity, is sued for discriminating against Plaintif on the basis of his disability: that, (1) he is an imprisoned inmate, (2) he is a non-smoking inmate exposed to ETS (Environmental Tobacco Smoke), and (3) exposure to ETS has exasperated his previous contracted STD (sexually transmitted disease).

95. Consistent with Title II of the Americans with Disability Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et.seq., D.C. Law 8-262 "Smoking Restriction Amendment Act of 1990" §7-1710,

Program Statement §1640.03 and Executive Order 13058, the Medical
Director of the Bureau of Prisons has allowed the extension, beyond
six months time, for compliance with the Program geared for moving
to a non-smoking environment. The Medical Director has allowed
for non-compliance wit the non-smoking Program that would have helped
protect the health and safety of staff and inmates, equally, in the
Bureau of Prisons. The Institution Supplement prohibiting staff from
smoking at Institutions, protected non-smoking staff, however, non-
smoking inmates were not protected. In addition, Executive Order
13058, forbidding all smoking in all federal buildings by anyone,
endorsed upon the Medical Director the responsibility for ensuring
that non-smokers were safe from persons smoking. This would have
resulted in the Medical Director rejecting Institution Supplement
§1640.03 as non-compliant and in favor of a total smoking ban in all
federal buildings.

    96. However, because of the Medical Director's failure, Plain-
tiff had been discriminated and full opportunity as on an equal
basis with staff to an environment unexposed to ETS whcih contrarily
to Institution Supplement, did not provide the non-smoking program
to inmates as it was available to staff. Therefore, the Medical
Director allowing the Institution Supplement to be extended beyond
the six months, discriminated against Plaintiff where enforcing the
fact that imprisoned; non-smoking inmates; who may have an STD;
exposed to second-hand smoke in federal buildings are entitled to

equal protection under Title II of the ADA and Fourteenth Amendment's
Due Process and Equal Protection Clauses, the same as staff who are
non-smoking, etc., is indicative of the Medical Director's culpab-
ility.

97. The Northeast Regional Director of the Bureau of Prisons,
D. Scott Dodrill, in his offical capacity, a public entity, is sued
for discriminating against Plaintiff on the basis of his disability:
that, (1) he is an imprisoned inmate, (2) he is a non-smoking inmate
exposed to ETS (Environmental Tobacco Smoke), and (3) exposure to
ETS has exasperated his previous contracted STD (sexually transmitted
disease).

98. Consistent with Title II of the Americans with Disability
Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et. seq.,
D.C. Law 8-262 "Smoking Regulations Amendment Act of 1990" §7-1710,
Program Statement §1640.03, and Executive Order 13058, the Northeast
Regional Director of the Bureau of Prisons has failed to oversee
that Program Statement §1640.03 in its mission statement outlining
that it was for helping to protect the health and safety of both
staff and inmates, equally in the Bureau of Prisons, was carried
through.

99. The compliance time of 6 months from the date of the Program
Statement had been extended well beyond that time as is evident by
Institution Supplement §1640.03. The fact that staff were allowed
participation in the program for non-smoking without the same partici-
pation for inmates, denied Plaintiff equal protection under the

program. Plaintiff had been denied full opportunity as on an equal
basis with staff to an environment unexposed to ETS according to
Executive Order 13058 forbidding all forms of smoking by anyone in
all federal buildings. Which contrarily, Institution Supplement did
not provide the non-smoking program to inmates as it was available
to staff. Even so, Plaintiff's appeals that he be separated from
all smokers because he is a non-smoker and exposure to ETS harms
his health and safety, were denied.

100. The Northeast Regional Director for the Bureau of Prisons
gave more consideration to smokers despite the program mission state-
ment to move toward non-smoking and not to mention the Executive Order
which banned all smoking in all federal buildings by anyone. The deni-
al of Administrative appeals to be separated, discriminated against
Plaintiff at his very request for being able to participate in the
program for non-smoking as on an equal basis with staff.

101. Therefore, the Northeast Regional Director for the Bureau
of Prisons, with overseeing Institution Supplement §1640.03 for
compliance with the Program for non-smoking discriminated against
Plaintiff, a non-smoker, in favor of non-smoking staff by failing to
reject policy for not enforcing the fact that imprisoned; non-smoking
inmates; who may have an STD; exposed to second-hand smoke in federal
buildings are entitled to Equal Protection under Title II of the
ADA and Fourteenth Amendment's Due Process and Equal Protection Clauses,
the same as staff who are non-smoking, etc., is indicative of the

Northeast Regional Director's culpability.

102. The Warden of FCI McKean, John J. LaManna, in his official capacity, a public entity, is sued for discriminating against Plaintiff on the basis of his disability: that, (1) he is an imprisoned inmate, (2) he is a non-smoking inmate exposed to ETS (Environmental Tobacco Smoke), and (3) exposure to ETS has exasperated his previous contracted STD (sexually transmitted disease).

103. Consistent with Title II of the Americans with Disability Act (ADA), Code of Federal Regulations- 28 CFR §35.101 et.seq., D.C. Law 8-262 "Smoking Regulations Amendment Act of 1990" §7-1710, Program Statement §1640.03, Institution Supplement §1640.03, and Executive Order 13058, the Warden of FCI McKean has failed to implement a non-smoking policy equally applied to both staff and inmates.

104. The policy endorsed or signed by the Warden calls for the participation of staff in a non-smoking Program in disregard to inmates. The mission of Program Statement §1640.03 was for helping to protect the health and safety of both staff and inmates, equally, in the Bureau of Prisons where smoking was concerned. Even acknowledging in the Institution Supplement that FCI McKean is a non-smoking institution yet, not allowing inmates to participate in that program is discrimination. Executive Order 13058 forbidded all forms of smoking in all federal buildings by anyone was ignored only to inmates and not to staff thereby, creating the inequality and the right of the inmate to health and safety.

105. Plaintiff in this regard, has been discriminated where he has been denied full opportunity as on an equal basis with staff to an environment unexposed to ETS. Plaintiff's request to the Warden for Administrative Remedy, that he be separated from all smokers, further shows his interest for participation in a Program for non-smoking. The benefit given only to non-smoking staff as opposed to non-smoking inmates discriminates against Plaintiff on the basis of his disability.

106. The Warden of FCI McKean therefore, has failed to comply with Program Statement §1640.03 within 6 months time without any extension for ensuring that both staff and inmates health and safety be protected. Finally, endorsing an Institution Supplement that discriminates upon Plaintiff and not enforcing the fact that imprisoned non-smoking inmates exposed to second-hand smoke in federal buildings are entitled to equal protection under Title II of the ADA and Fourteenth Amendments Due Process and Equal Protection Clauses, the same as staff who are non-smokers, etc., is indicative of the Warden's culpability.

B. Title V. of the Americans with Disability Act

107. The United States Justice Department in its official capacity, as a public entity, by and through its agents, officers, or employees have retaliated, interferred with, coerced, and intimidated Plaintiff because he has opposed the act and practice of discriminating against non-smoking inmates in his Administrative

Requests for separation of smokers from non-smokers and with filing

an ensuing lawsuit. The United States Justice Department has retal-

iated, interferred with, coerced, and intimidated Plaintiff by

attempting to deny him access to the courts when transferring him from

FCI McKean to FCI RayBrook which was not according to any legitimate

policy concerns. That, Plaintiff upon arriving at FCI RayBrook was

subject to continuous exposure of indoor smoking, the very thing

that Plaintiff filed grievances and lawsuit against. Plaintiff had

been placed in a 6-man cell where between 3-5 other inmates at any

given time were smokers. Plaintiff was denied his right to benefit

from forma pauperis where staff, officers, or employees at FCI Ray-

Brook refused to extract funds. Plaintiff had been denied proper

legal correspondence where mail is opened only in the presence of

him. Plaintiff had been denied adequate law library and access to

it when prosecuting his lawsuit. Plaintiff had been continuously

denied by his Case Manager D. Salamy, an employee, officer, or staff

member of the United States Justice Department, a qualified low-level

security transfer due to the fact he doesn't fit the criteria for

a medium/high security and because of that, his safety has become

an issue to maintaining access to the court.

108. The Bureau of Prisons in its official capacity, as a public

entity, by and through its agents, officers, or employees have retal-

iated, interferred with, coerced, and intimidated Plaintiff because

he has opposed the act and practice of discriminating against non-

smoking inmates in his Administrative Requests for separation of

smokers from non-smokers and with filing an ensuing lawsuit.
The Bureau of Prisons has retaliated, interferred with, coerced,
and intimidated Plaintiff by attempting to deny access to the
courts when transferring him from FCI McKean to FCI RayBrook which
was not according to legitimate policy concerns. That, Plaintiff
upon arriving at FCI RayBrook had been subject to a continuous
exposure to indoor smoking, the very thing that Plaintiff filed
grievances and lawsuit against. Plaintiff had been placed in a
6-man cell where between 3-5 other inmates, at any given time, were
smokers. Plaintiff was denied his right to benefit from forma pauperis
where staff, officers, or employees at FCI RayBrook refused to extract
funds. Plaintiff had been denied proper legal correspondence where
mail is opened only in his presence. Plaintiff had been denied adeq-
uate Law Library and access to it when prosecuting his lawsuit.
Plaintiff had been continuously denied by his Case Manager D. Salamy,
an employee, officer, or staff member of the Bureau of Prisons, a
qualified low-level security transfer due to the fact he doesn't
fit the criteria for medium/high security and that because of that
his safety has become an issue to maintaining access to the court.

    109. The Director of the Bureau of Prisons in his official
capacity, a public entity and in his individual capacity, by and
through his agents, officers, or employees have retaliated, inter-
ferred with, coerced and intimidated Plaintiff because he has opposed
the act and practice of discriminating against non-smoking inmates

in his Administrative Requests for separation of smokers from non-smokers and with filing an ensuing lawsuit. The Director of the Bureau of Prisons has retaliated, interferred with, coerced, and intimidated Plaintiff by attempting to deny access to the courts when transferring him from FCI McKean to FCI RayBrook which was not according to any legitimate policy concerns. That Plaintiff upon arriving at FCI RayBrook had been subject to a continuous exposure to indoor smoking, the very thing that Plaintiff filed grievances and lawsuit against. Plaintiff had been placed in a 6-man cell where between 3-5 other inmates, at any given time, were smokers. Plaintiff was denied his right to benefit from forma pauperis where staff, officers, or employees at FCI RayBrook refused to extract funds. Plaintiff had been denied proper legal correspondence where mail is supposed to be opened only in the presence of the inmate. Plaintiff had been denied adequate law library and access to it when prosecuting his lawsuit. Plaintiff had been continuously denied by his Case Manager D. Salamy, an employee, officer, or staff member of the Bureau of Prisons, a qualified low-level security transfer due to the fact he doesn't fit the criteria for medium/high security and that becuase of that his safety has become an issue to maintaining access to the court. That because Plaintiff has a Central Inmate Monitoring Status (CIMS) placed against him, any transfer request must be routed and approved by the Bureau of Prisons Central Office. In this instance, Plaintiff filing grievances against Bureau of Prisons officers, employees, or staff, and its ensuing lawsuit, a

transfer made thereafter was the logical domain of the Central
Office under the Director of the Bureau of Prisons to approve.
That, the Director of the Bureau of Prisons has direct and immediate
control of the officers, employees, or taff that is working or paid
under its auspices. That therefore, the Director of the Bureau of
Prisons has the power to retaliate, interfere with, coerce and
intimidate at great distances.

110. The Northeast Regional Director, D. Scott Dodrill, in his
official capacity, a public entity, and in his individual capacity,
by and through his agents, officers, or employees have retaliated,
interferred with, coerced, and intimidated Plaintiff because he
has opposed the act and practice of discriminating against non-smoking
inmates in his Administrative Request for separation of smokers from
non-smokers and with filing an ensuing lawsuit. The Northeast
Regional Director has retaliated, interferred with, coerced, and
intimidated Plaintiff by attempting to deny access to the courts
when transferring him from FCI McKean to FCI RayBrook which was
not according to legitimate policy concerns. That, Plaintiff upon
arriving at FCI RayBrook had been subject to a continuous exposure
to indoor smoking, the very thing that Plaintiff filed grievances
and lawsuit against. Plaintiff had been placed in a 6-man cell where
between 3-5 other inmates, at any time, were smokers. Plaintiff was
denied his right to benefit from forma pauperis where staff, officers,
or employees at FCI RayBrook refused to extract funds. Plaintiff
had been denied proper legal correspondence where mail is opened

only in his presence. Plaintiff had been denied adequate Law Library
and access to it when prosecuting his lawsuit. Plaintiff had been
continuously denied by his Case Manager D. Salamy, an employee,
officer, or staff member of the Bureau of Prisons, a qualified low-
level security transfer due to the fact he doesn't fit the criteria
for medium/high security and that because of that his safety has
become an issue to maintaining access to the court. That, at the
time of Plaintiff's transfer, all transfer requests must be routed
through the Regional Director before referred to Central Office,
in the case of a CIM (Central Inmate Monitoring).

111. The Warden of FCI McKean, John J. LaManna, in his official
capacity, a public entity, and in his individual capacity, by and
through his agents, officers, or employees have retaliated, interfer-
red with, coerced, and intimidated Plaintiff because he has opposed
the act and practice of discriminating against smokers from non-smokers
and with filing an ensuing lawsuit. The Warden of FCI McKean has
retaliated, interferred with, coerced, and intimidated Plaintiff by
subjecting him to second-hand smoke when placing him in the
upper tier cell of Unit CB where smokers still lingered about smoking
cigarettes or tobacco products despite the mandate requiring all
smokers to smoke outdoors. That, because cigarettes or tobacco
products were still being sold on the commissary, the enforcing of
a no indoor smoke policy was virtually impossible. Plaintiff was
also retaliated, interferred with, coerced, and intimidated where
the Warden attempted to deny him access to the courts when trans-

ferring him from FCI McKean to FCI RayBrook which was not according
to legitimate policy concerns. That, Plaintiff upon arriving at
FCI RayBrook had been subject to a continuous exposure to indoor
smoking, the very thing that Plaintiff filed grievances and lawsuit
against. Plaintiff had been placed in a 6-man cell where between
3-5 other inmates, at any time, were smokers. Plaintiff was denied
his right to benefit from forma pauperis where staff, officers,
or employees at FCI RayBrook refused to extract funds. Plaintiff
had been denied proper legal correspondence where mail is opened
only in his presence. Plaintiff had been denied adequate Law Library
and access to it when prosecuting his lawsuit. Plaintiff had been
continuously denied by his Case Manager D. Salamy, an employee,
officer, or staff member of the Bureau of Prisons, a qualified low-
level security transfer due to the fact he doesn't fit the criteria
for medium/high security and that because of that, his safety has
become an issue to maintaining access to the court. That, at the
time of Plaintiff's transfer, all transfer requests must be routed
through the Warden before referred to the Regional Office/Central
Office in the case of a CIM (Central Inmate Monitoring).

C. Bivens Action

    112. Harley G. Lappin, Director of the Bureau of Prisons, in
his individual capacity, is sued for violating Plaintiff's consti-
tutional rights under the Eighth and Fourteenth Amendments. Harley
G. Lappin with wanton and reckless disregard denied Plaintiff the

right to be free of exposure to Environmental Tobacco Smoke (ETS).
Harley G. Lappin deliberately with indifference allowed Program
Statement §1640.03 to stand which allowed permissively the Wardens
of institutions to designate smoking inside of buildings. Executive
Order 13058 which became public law, specifically forbidded all
smoking in all federal buildings by anyone. Harley G. Lappin as
Director of the Bureau of Prisons had an obligation to ensure that
the health and safety of both staff and inmates, equally, while
in the Bureau of Prisons.

113. The Program Statement permissively allowing Wardens of
Institutions to set policy regarding smoking and non-smoking as
to staff or inmates, gave the right of way for treating unequally
non-smoking inmates from that of non-smoking staff. The Institution
Supplement §1640.03 states in direct terms that, "staff are pro-
hibited from smoking inside of buildings... or main institution."
However, for inmates, smoking is permitted in inmate rooms of the
Housing Units, of the Main Institution.

114. Harley G. Lappin deliberately with reckless disregard
created the atmosphere whereby Wardens would treat unequally inmates
from staff. This was not only inequality of treatment but, in
blatant disregard for Executive Order in which result constitutes
a cruel and unusual punishment. Harley G. Lappin allowed Plaintiff
to be subject to Environmental Tobacco Smoke at a time when the
public at large was against such exposure.

115. Plaintiff injury as a result of his unequal treatment by the neglect of Harley G. Lappin was his coughing; production of sputum; skin, nose, and eye irritations; hardening of tissue; loss of hair follicles; chest pains; racing heart, nervousness, dizziness; headaches; loss of appetite; weight loss; exasperation of previously contracted STD; possible cancer; as well as injuries not known at this time.

116. Newton E. Kendig, Medical Director of the Bureau of Prisons, in his individual capacity, is sued for violating Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments. Newton E. Kendig wantonly with reckleass disregard, deliberately with indifference failed to curb non-compliance for indoor smoking beyond those times specified by Program Statement §1640.03. The FCI McKean Institution Supplement §1640.03 issued under the Warden failed to come into compliance with protecting the health and safety of both staff and inmates, equally.

117. Non-smoking staff were protected under Institution Supplement §1640.03 as opposed to non-smoking inmates from the exposure to ETS. Newton E. Kendig knew this as the Regional Health Systems Administrator was forwarded a copy of the Institutions Supplement for reporting to Newton E. Kendig, himself. Further, Executive Order 13058 forbidding all smoking in all federal buildings to anyone, commanded Newton E. Kendig to rescind or make non-compliant any policy thereafter allowing for smoking in federal buildings.

118. The fact that the public at large, through the EPA, had condemned second-hand smoke as the cause of cancer, mandated Newton E. Kendig to suspend all policies allowing for smoking, especially indoor. However, Newton E. Kendig wantonly with reckleass disregard diliberately with indifference to Plaintiff and non-smoking inmates on a whole failed to disapprove the continued policies for indoor smoking, thus causing Plaintiff to experience cruel and unusual punishment.

119. As a result, Plaintiff has become injured from the unequal treatment and cruel and unusual punishment caused by Newton E. Kendig. The neglect of Newton E. Kendig has sufferred Plaintiff coughing; production of sputum; skin, nose, and eye irritations; hardening of tissue; loss of hair follicles; chest pains; racing heart; nervousness; dizziness; headaches; loss of appetite; weight loss; exasperation of previously contracted STD; possible cancer; as well as injuries not now known at this time.

120. D. Scott Dorill, Northeast Regional Director, in his individual capacity, is sued for violating Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments. D. Scott Dodrill wantonly with reckless disregard, deliberately with indifference allowed Institution Supplement §1640.03 to stand at FCI McKean while exercising Regional Director authority to disapprove such. For this reason, policy did not provide equal protection to non-smoking inmates as it did to non-smoking staff. Further, because Executive Order 13058 commanded no-smoking in all federal buildings

by anyone, D. Scott Dodrill was directed to assure that not only
were staff not allowed to smoke in federal buildings, but inmates
as well.

121. Program Statement §1640.03 issued direct authority to
D. Scott Dodrill for coming into compliance with smoking policies
that were geared for protecting the health and safety of both staff
and inmates of which was deliberately with indifference ignored.
Plaintiff in this cause, appealed directly to D. Scott Dodrill
requesting that he review his request to be separated from all
smokers and not to be exposed to ETS as he was suffering from its
result. However, D. Scott Dodrill wantonly with blatant disregard
for Plaintiff's pain and suffering, denied his appeal thereby,
subjecting him to cruel and unusual punishment.

122. Plaintiff's injury as a result of his unequal treatment
and cruel and unusual punishment caused by D. Scott Dodrill's
neglect was his coughing; production of sputum; skin, nose, and
eye irritations; hardening of tissue; loss of hair follicles; chest
pains; racing heart; nervousness; dizziness; headaches; loss of
appetite; weight loss; exasperation of previously contracted STD;
possible cancer; as well as injuries not known at this time.

123. John J. LaMann, (formerly) Warden of FCI McKean, in his
individual capacity, is sued for violating Plaintiff's constitutional
rights under the Eighth and Fourteenth Amendments. John J. LaManna
with wanton and reckleas disregard denied Plaintiff the right to
to be free of exposure to Environmental Tobacco Smoke (ETS).

John J. LaManna in addition, with wanton reckless disregard deliberately failed to regard Executive Order 13058 forbidding all smoking in all federal buildings by anyone. The result, when the public at large regarded Tobacco and its effect of ETS, a cause of cancer, constituting cruel and unusual punishment.

124. For this reason, Plaintiff personally requested John J. LaManna that he wished not to be exposed to second hand smoke; that he wished to be separated from all smokers. John J. LaManna wantonly with reckless disregard, deliberately with indifference refused Plaintiff's Administrative Request to not be exposed to ETS, thus subjecting him to cruel and unusual punishment.

125. Plaintiff's injury, as a result of his unequal treatment and cruel and unusual punishment caused by John J. LaManna's neglect, was his coughing; production of sputum; skin, nose, and eye irritations; hardening of tissue; loss of hair follicles; chest pains; racing heart; nervousness; dizziness; headaches; loss of appetite; weight loss; exasperation of previously contracted STD; possible cancer; as well as injuries not known at this time.

## CONFLICT OF LAW ANALYSIS

126. The Conflict of Law Analysis is appropriate in this case where there are multiple acts or omissions committed in multiple states. Here, the states at issue are Pennsylvania, Washington, D.C., and more recently New York. Assuring that there is a conflict, the first step to the conflict of law analysis is to select a choice

of law under the Federal Tort Claims Act (FTCA) where acts or
omissions occurred in more than one state.

127. This selection would render the District of Columbia's
choice of law rules as applicable but, where it would be Pennsyl-
vania's, the choice of law rule would be the same. Now, the choice
of law rules in the District of Columbia is the interest analysis.
Under the interest analysis, the factors to be considered are: (a)
the place where the injury occurred; (b) the place where the conduct
causing the injury occurred; (c) the domicil, residence, nationality,
place of incorporation and place of business of the parties, and;
(d) the place where the relationship, if any, between the parties
is centered.

128. Here, Plaintiff although incarcerated in Pennsylvania,
did not have an "enduring relationship" with the state. His domicile
as is before incarceration has always been maintained in Detroit,
MI. The Defendants in this case, either the Government or employees
of the Government is nevertheless a corporation of national scope,
headquartered in Washington, D.C. with satellite institutions over
the whole United States in which supervision is exercised from
Washington, D.C. As a result, Washington, D.C. has a great interest
in having its laws applied to decide the liability of a business
headquartered there.

129. Similarly, the place of injury if fortuitous considering
the fact that the Government is headquartered in Washington, D.C.
The same procedures would have been followed at any of its satellite